

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 31, 2024

<u>BY ECF</u>

The Honorable Barbara Moses
United States Magistrate Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    **Re:**    ***United States v. Christian Lugo*, 24 Cr. 606 (DEH)**

Dear Judge Moses:

    The Government respectfully submits this letter in opposition to defendant Christian Lugo's motion for pre-trial release in the above-captioned case, which has been referred to Your Honor by District Judge Dale E. Ho.  (Dkt. 11)[1]  As explained in greater detail below, Lugo presents a danger to the community and is a substantial flight risk.  Lugo was the leader of a large scale criminal enterprise that corrupted the operations of an auto repair and tow truck shop known as Certified Auto that sought to control its territory in the Bronx through violence and fear.  Lugo's criminal enterprise made money through substantial amounts of insurance, wire, and mail fraud.  And on February 7, 2022, Lugo ordered a subordinate member of his enterprise—co-conspirator-1 ("CC-1")—to shoot at members of a rival tow truck shop whom Lugo believed had just assaulted a tow truck driver who worked for Lugo.  CC-1 did so, firing multiple shots at the rivals, which resulted in the murder of Gloria Ortiz and non-fatal gun shot wounds to two other people.  Lugo's leadership in the racketeering enterprise, the violent nature of the charged criminal conduct, the mandatory life sentence Lugo faces upon conviction, and Lugo's criminal history all weigh in favor of continued detention in this presumption case.  Accordingly, the Government respectfully requests that Lugo's motion be denied, consistent with the recommendation of Pretrial Services.

**I.**  <u>Overview</u>

    At trial, the Government's evidence will show the following and will be based on the testimony of multiple cooperating, law enforcement, and eyewitnesses; business and insurance records; toll records; and surveillance footage, among other evidence.

    Since at least 2019 until February 2022, Lugo controlled the Certified Auto tow truck / auto repair shop located in the Bronx.  Lugo made money by committing various types of insurance

---

[1] The defense motion for pretrial release has not yet been docketed on ECF.

fraud on the cars that were towed to Certified Auto and would compete with other tow-truck/auto-repair companies for business, often resorting to violence. In particular, starting in or about 2019, Lugo was in a dispute with another auto repair and tow truck company located nearby in the Bronx called "First Choice." In or about 2021, the owner of First Choice was murdered in connection with a towing dispute and his wife, Gloria Ortiz, took over the business. In 2022, Ortiz and Lugo continued their rivalry over tow business in the Bronx, which ultimately resulted in the February 7, 2022 murder of Ortiz and non-fatal injuries to the two other victims just described.

### A. Lugo's Corruption of the Certified Auto Tow Truck Shop

When cars get into auto crashes in the Bronx, the drivers will typically call 911 to report the incident. If the cars are too damaged, they will need to be towed to an auto repair shop. Legitimate tow truck shops will employ registered and insured tow trucks who will be dispatched by a dispatcher based on a variety of legitimate factors such as proximity to the accident. Lugo, however, employed drivers who operated unlicensed pickup trucks that had hidden tow truck machinery underneath the pickup trucks. They operated as so-called "chasers" who monitored police radios for car accidents and raced to the scenes of accidents to attempt to convince the car's occupant to tow the damaged vehicle to Certified Auto.

Once towed to a repair shop, a legitimate repair shop will assess the repairs and put in the claim to the insurance company either for repairs or for total destruction. The insurance companies will typically pay out the claim directly to the auto repair company, who will then also charge the customer a deductible.

Lugo and his subordinates at Certified Auto, however, made money at their tow truck by committing brazen frauds. For example, Lugo would often take money from insurance companies to repair cars that were towed to Certified Auto and then simply not repair the cars. Even when customers came to complain, Lugo would ignore the customers, keep the cars at the shop, and then later seek title for the cars as abandoned. Because small claims court was the only option for these customers to reclaim their damaged cars, Lugo did not care about being sued in small claims court because the shop was in the name of the mother of Lugo's children, and so he disregarded the small claims court suits when they came.[2]

Other times, Lugo would take a car from an accident and damage it more to increase the cost of the repairs. If the car was new, Lugo would sometimes take the new parts off the vehicle and sell them and then report to the insurance company that the parts were stolen. Lugo also made money by overcharging insurance companies for repairs that may or may not have been performed. At times, Lugo would pay the insurance adjusters bribes so that they would write up the paperwork for more damage than had occurred.

Finally, Lugo also made money by referring individuals involved in car accidents to physical therapists, regardless of whether they were actually injured. In return, the physical therapists would pay Lugo a kickback per person referred by Lugo.

---

[2] The mother of Lugo's children now purports to be one of Lugo's bond co-signers.

Because of the various frauds that Lugo perpetrated through the Certified Auto enterprise, each car that was successfully towed to the shop was very valuable—often bringing in tens of thousands of dollars in fraud proceeds per car.  As a result, Lugo often had disputes with other shops operating in the same area over the right to tow certain cars in Certified Auto's claimed territory, which often rose to acts of violence. For example, tow truck drivers from rival shops sometimes showed up to the same accident scene and the tow truck drivers threatened violence until one of them backed down.  As a result, Lugo's tow truck drivers often possessed and brandished firearms during these disputes.

In particular, Lugo, whose shop was in the 40th NYPD police precinct, had a rivalry with another shop in the adjacent 41st NYPD Precinct called "First Choice," which, as discussed above, was operated by murder victim Ortiz and her partners.  Because the shops tended to find many accidents via police radios, they generally referred to Certified Auto's territory as the 40th precinct's while First Choice claimed the 41st precinct.

## B.  Lugo Orders the Shooting that Results in the February 7, 2022 Murder of Ortiz

On February 7, 2022, one of Lugo's tow truck drivers ("Driver-1") got into a car accident while driving one of Lugo's pickup trucks (illegally used as a tow truck) with a passenger vehicle in the 41st NYPD police precinct—that is, in First Choice's territory, not in Certified Auto's territory.  Nevertheless, Driver-1 persuaded the driver of the passenger vehicle to take his damaged car to Certified Auto.  Members of First Choice arrived at the scene and observed that Driver-1 had persuaded the driver of the passenger car to have his car repaired at Certified Auto despite the accident taking place in First Choice's claimed territory.  After a confrontation with Driver-1 about their respective towing territory, the First Choice members then violently assaulted Driver-1 who eventually managed to flee and inform Lugo what had happened.

Lugo then sent CC-1 to pick up Driver-1 where they all met up with Lugo.  At that meeting, Lugo instructed CC-1 to shoot at the First Choice members who had assaulted Driver-1, including a particular member of First Choice who was believed to have been the one who assaulted Driver-1 ("Victim-1"), in order to further the Certified Auto criminal enterprise.  CC-1 then drove to Certified Auto, where Ortiz, Victim-1, and other members of First Choice had gathered including Victim-2, in an apparent attempt to confront Certified Auto members about the incident involving Driver-1.  CC-1 fired into the crowd towards Victim-1 but instead hit and killed Ortiz, struck Victim-2, and struck a bystander ("Victim-3").  Victim-1 was unharmed and returned fire with his gun, as did another member of First Choice.

After the murder, Lugo admittedly fled to Florida (closing Certified Auto) where he remained until recently, when according to the Pretrial Services report, Lugo has resumed working in the tow truck industry in the Bronx under a new shop's name.

## C.  The Indictment and Lugo's Arrest

On October 17, 2024, the Grand Jury returned the Indictment (Dkt. 2), charging Lugo with the following offenses in six Counts:

| Count | Statute (18 U.S.C. § ) | Description |
|---|---|---|
| **1** | 1962(d) | Participating in a racketeering conspiracy relating to Lugo's leadership of the Certified Auto criminal enterprise. |
| **2** | 1959(a)(5) | Murder and assault with a dangerous weapon in aid of racketeering, relating to Lugo's participation in the murder of Gloria Ortiz on or about February 7, 2022. |
| **3** | 1959(a)(1) and (a)(3) | Conspiracy to commit murder in aid of racketeering, relating to Lugo's participation in a conspiracy to murder a member of a rival tow truck company on or about February 7, 2022, which resulted in the murder of Gloria Ortiz. |
| **4** | 1959(a)(3), (a)(5) | Attempted murder and assault with a dangerous weapon in aid of racketeering, relating to Lugo's participation in the non-fatal shootings of Victim-1, Victim-2 and Victim-3. |
| **5** | 924(c)(1)(A)(i), (ii), (iii), and 2 | Use, carrying, brandishing, and discharging a firearm, and aiding and abetting the same, during and in relation to the crime of violence charged in Count Two. |
| **6** | 924(c)(1)(A)(i), (ii), (iii), and 2 | Use, carrying, brandishing, and discharging a firearm, and aiding and abetting the same, during and in relation to the crime of violence charged in Count Four. |

Law enforcement agents arrested Lugo on October 22, 2024, in his apartment in the Bronx. During the resulting search of Lugo's apartment, agents recovered, among other things, a single live round of ammunition.

## II.  Applicable Law

The Government ultimately bears the burden of showing by a preponderance of the evidence that the defendant poses a risk of flight or, by clear and convincing evidence, that the defendant poses a danger to the community, and that no condition or combination of conditions can address those risks.  *See* 18 U.S.C. § 3142(f); *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007); *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).

However, when, as in this case, a defendant is charged with a firearms offense under 18 U.S.C. § 924(c), "it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community."  18 U.S.C. § 3142(e)(3)(B).

In assessing a defendant's risk of flight and the danger to the community presented by release, Congress directed courts to consider several factors: (1) the "history and characteristics of the person" including "family ties, employment, financial resources, length of residence in the community, [and] community ties"; (2) "the nature and circumstances of the offense charged"; (3) "the weight of the evidence against the person"; and (4) the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). Title 18, United States Code, Section 3142(e) provides that if a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the defendant shall be detained pending trial. 18 U.S.C. § 3142(e).

"Because the 'rules concerning admissibility of evidence in criminal trials do not apply' to bail hearings, *see* 18 U.S.C. § 3142(f)(2)(B), the parties may proceed by way of proffer, *United States v. LaFontaine*, 210 F.3d 125, 130-31 (2d Cir. 2000). As such, courts often base detention decisions on hearsay evidence and on factual material proffered by the Government. *United States v. Boustani*, 356 F. Supp. 3d 246, 251 (E.D.N.Y. 2019), *aff'd*, No. 19-344, 2019 WL 2070656 (2d Cir. Mar. 7, 2019).

## III. <u>Discussion</u>

Lugo cannot overcome the presumption of detention. Even if he could, there are no conditions that could assure the community's safety or that Lugo would appear in this Court in light of, among other things, the seriousness of the offense; his admitted flight from the Bronx after the murder; his criminal history; and the penalties he faces.

### A. **Lugo Poses a Danger to the Community**

Lugo was the leader of a racketeering enterprise for a multi-year period culminating in him order a shooting that resulted in the murder of Gloria Ortiz. After the murder, Lugo almost immediately fled the jurisdiction, relocating to Florida, until recently returning to the Bronx where he has admittedly resumed operating a tow truck shop. Lugo's brazen conduct in ordering a subordinate of his criminal enterprise to engage in a broad daylight shooting into a crowd of his rivals, resulting in a murder, was, without a doubt, among the most serious and dangerous crimes there is. And there is every reason to believe Lugo intends to resort to the same criminal conduct in his continuing efforts to control the tow truck industry in parts of the Bronx. Indeed, Lugo's access to firearms and ammunition—which he cannot legally possess given his criminal record— was evidenced incident to his arrest when agents found a bullet in his apartment. And Lugo reported to Pretrial Services that he is again working as the owner of a tow truck shop in the Bronx.

In short, Lugo's conduct was egregious, spanned a substantial period of time, and was extremely dangerous, eventually resulting in a murder. Lugo has now returned to the Bronx, working in the same industry as before, thereby increasing the risk to the public of additional violent crime. The Court should detain Lugo to protect the community.

**B.  Lugo Presents a Substantial Risk of Flight**

The seriousness of the offense is also reflected in the seriousness of the penalties now facing Lugo.  The charges contained in the Indictment carry a mandatory sentence of death or life imprisonment plus a mandatory consecutive sentence of 20 years' imprisonment.  Accordingly, Lugo has a strong incentive to flee.

Indeed, Lugo's ability to flee is not merely theoretical.  He admittedly fled to Florida almost immediately after the Ortiz murder.  Furthermore, as described above, the evidence against Lugo is strong, compounding the flight risk.  The evidence includes, among other things, significant amounts of surveillance video footage, cooperating, eyewitness, and law enforcement witness testimony, and documentary evidence proving Lugo's leadership in the racketeering enterprise, and his role in ordering the shooting that resulted in the murder.  The strength of the evidence militates strongly in support of detention.

Moreover, Lugo's criminal history shows that he has engaged in criminal conduct since at least 2005 when he was arrested for and ultimately convicted in the U.S. District Court for the Eastern District of New York with importation of heroin when he was caught trying to smuggle heroin into the country at JFK airport.  His criminal history also includes multiple bench warrants in connection with state arrests for, among other things, fleeing from police (while in his tow truck), and robbery and assault.  Moreover, just a few weeks ago, Lugo was arrested after he used his tow truck as the getaway driver for a grand larceny of a storage unit believed to belong to a wealthy individual.

In sum, Lugo has every incentive to flee, has not been able to remain law abiding, and has shown a past ability to relocate out of state after the murder.  There is, therefore, a substantial risk of flight.

**C.   The Court Should Reject the Lugo's Arguments for Bail**

Lugo's primary argument for bail is that he has several family members and friends willing to co-sign a bond.  (Def. Mot. at 2-3).  Lugo also claims that the racketeering conspiracy ended in 2022 and is not ongoing, and that home detention would be appropriate.  (*Id.*)

This Court should reject these arguments.  For starters, as described in some detail above, the Government's evidence is strong and based on multiple and corroborating types of evidence.  Moreover, Lugo's reliance on proposed co-signers (who have not been vetted) is not a basis for release.  Those same individuals—whom Lugo claims to have known for many years—did not prevent Lugo from becoming the leader of a criminal enterprise or of ordering an act of extreme violence resulting in a murder.  Indeed, the Court should have no confidence that Lugo will not flee or perpetrate more violence in the community if he is released.

Lastly, ankle-bracelet monitoring is insufficient in this case. Bracelets can easily be removed, and given the Lugo's strong incentives to flee, do nothing more than reduce his head start should he decide to cut the bracelet and flee. *See United States v. Freeman*, 21 Cr. 88 (JSR) (S.D.N.Y. Feb. 19, 2021) (noting during bail appeal that "what about the fact that it is well

established that electronic monitoring, even before the pandemic, was often not adequate to secure someone's presence? I must have had . . . in my 25 years on the bench, 100 cases in which someone was under electronic monitoring, yet still managed to go other places. . . . Anyone who knows the technology of electronic monitoring knows that it is far from foolproof"); *United States v. Zarger*, No. 00 Cr. 773, 2000 WL 1134364, at *1 (E.D.N.Y. Aug. 4, 2000) (rejecting defendant's application for bail in part because home detention with electronic monitoring "at best . . . limits a fleeing defendant's head start"); *see also United States v. Casteneda*, No. 18 Cr. 047, 2018 WL 888744, at *9 (N.D. Cal. Feb. 2018) (same); *United States v. Anderson*, 384 F. Supp.2d 32, 41 (D.D.C. 2005) (same); *United States v. Benatar*, No. 02 Cr. 099, 2002 WL 31410262, at *3 (E.D.N.Y. Oct. 10, 2002) (same).

Accordingly, the Court should reject Lugo's arguments for pretrial release.

## IV.  **Conclusion**

There are no conditions of release that could reasonably assure Lugo's continued appearance in this case or ensure the safety of the community, as is required for pre-trial release, and Lugo has not rebutted the presumption in favor of detention.

Rather, this matter presents a clear case for pre-trial detention.  The Government respectfully requests that, consistent with Pretrial Service's recommendation, the Court order Lugo's continued detention pending trial.


                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney

              By:    _____
                              Michael R. Herman
                              Assistant United States Attorney
                              (212) 637-2221