UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

UNITED STATES OF AMERICA

               -against-

CHRISTIAN LUGO,

                    Defendant.

------------------------------------------------------------------------X

Docket No.

24 Cr. 606 (DEH)


# SENTENCING MEMORANDUM FOR
# DEFENDANT CHRISTIAN LUGO


*Attorneys for Christian Lugo*:

KARLOFF C. COMMISSIONG, ESQ.
405 Broadway, 9th Floor
New York, New York 10174
(718) 415-3116

STEPHEN TURANO, ESQ.
275 Madison Avenue, 35th Floor
New York, New York 10016
(917) 594-5666

KARLOFF C. COMMISSIONG, ESQ.

ATTORNEY AT LAW
405 LEXINGTON AVENUE
9TH FLOOR
NEW YORK, NY 10174

January 16, 2026

**<u>VIA E.C.F. AND EMAIL</u>**

Hon. Nelson S. Roman
United States District Judge
United States Courthouse
40 Foley Square
New York, New York 10007

Re: <u>United States v. Christian Lugo</u>, 24 Cr. 606 (DEH)

Dear Judge Ho:

      Since his incarceration at the Metropolitan Detention Center, Christian Lugo has lived with a constant awareness of the harm that brought him before this Court.  The consequences of his actions — irreversible and devastating — are never distant abstractions.  They are present in his thoughts, his prayers, and his daily efforts to endure confinement with discipline rather than despair.  Christian does not minimize what occurred, nor does he deflect responsibility.  He understands that a life was lost, that two others were injured, and that no sentence can undo that harm.

      That awareness is sharpened by the fact that the woman who lost her life, Gloria Ortiz, was not a stranger to him.  She was a long-time family friend, someone he has known and loved well before the events of February 7, 2022.  Her death has weighed heavily on him from the outset, not as a means of seeking sympathy, but as a source of profound and inescapable guilt.  Christian Lugo has expressed repeatedly that the knowledge that his conduct contributed to the death of someone he knew — someone whose children are now without their mother —

2

is a burden he will carry for the rest of his life.  That moral injury, unlike any sentence this Court may impose, is permanent.

In this environment, Christian Lugo has chosen neither withdrawal nor resentment. Instead, he has carried himself with a quiet seriousness, marked by work, service, and an effort to impose moral order on circumstances defined by deprivation and instability.  While housed at MDC, he has maintained three institutional jobs, including serving as the orderly on his unit, tutoring other incarcerated men preparing for the GED, and cleaning the visitation area — labor for which he earns thirteen dollars per month.  He has completed educational and therapeutic programming, and he has sought out mental-health support when the weight of incarceration and remorse became overwhelming.

Christian's time at MDC has not been without hardship.  Early in his incarceration, concerns about depression led to his placement in the mental-health unit following a deeply personal letter he wrote — an episode reflecting not manipulation, but emotional despair. Since then, with the support of a BOP mental-health professional, he has engaged in counseling focused on managing anxiety, frustration, and long-standing resentments rooted in trauma and abandonment.  Even in the face of further distressing experiences while incarcerated, Christian Lugo has continued to push forward rather than retreat inward.

Most telling is how he has used what little agency he retains to serve others.  Christian runs a Bible study on his unit twice each week, a group that began with five men and has grown to approximately thirty.  He prepares lessons, leads discussions, and uses lived experience — including his own failures — to urge others toward restraint, accountability, and self-reflection. He has drafted a vocational syllabus proposing a Bureau of Prisons program to teach towing and automotive skills, hoping to give others a lawful means of earning a living upon release.

On one occasion, he intervened to save the life of a fellow incarcerated man who was attempting to take his own life, physically pulling him down and preventing a tragedy.

These actions do not erase the seriousness of Christian's offense.  They do, however, reflect a man who is not indifferent to human life — a man who is reckoning with the consequences of his past conduct.  He does not ask this Court to look away from what he has done.  Christian asks only that the Court see who he is now and sentence him accordingly.  For Christian, his faith offers not just a road to spiritual clarity but a structured framework for healing, growth, and accountability.

It is in this context that we submit this letter as Christian Lugo's sentencing recommendation.  We request that the Court impose a sentence of 180months and mental health treatment pursuant to the Court's authority under 18 U.S.C. §3553(a) and *United States v. Booker*, 543 U.S. 220 (2005).

## I.  FAMILY BACKGROUND AND UPBRINGING[1]

### INTRODUCTION

Poverty is trauma.  It is important to understand this in the context of Christian's background and history.  According to our current understanding of poverty and its effect on childhood development:

> Poverty, neglect, housing instability, violence, food insecurity, and separation from parents all affect childhood development – and thus, lifelong health. Although children are born ready to learn and grow, adverse childhood experiences (ACEs) are traumatic events that occur in youth resulting in toxic stress…However, the American Academy of Pediatrics clarifies, 'While some stress in life is normal—and even necessary for development—the type of stress that results when a child experiences ACEs may become toxic when there is strong, frequent, or prolonged activation of the body's stress response systems in

---

[1] Christian Lugo's personal and family histories are detailed in the P.S.R. at ¶¶ 72 – 83, his physical condition, and mental and emotional health, are discussed at ¶¶ 84 – 93; and his substance abuse, education and vocational skills, employment, and financial condition are discussed at ¶¶ 94 – 116.

the absence of the buffering protection of a supportive, adult relationship.' And this toxic response can be destructive over the lifetime.[2]

These circumstances contributed to Christian's impulsiveness, poor judgment, and ultimately, his involvement in the instant offense.

## MATERNAL AND PATERNAL HISTORY: A FAMILY SYSTEM SHAPED BY TRAUMA AND INSTABILITY[3]

Christian Lugo was born into a family system marked by unresolved trauma, instability, and violence on both sides of his lineage.  Neither parent entered adulthood with the emotional tools or supports necessary to provide a stable and protective environment, and the consequences of those deficits were borne early and repeatedly by their children.  Christian's mother, Elaine Claudio, was herself raised amid abuse and abandonment. Though she described her early childhood as materially stable, that stability collapsed when her parents separated and she was subjected to physical abuse and an attempted sexual assault by her stepfather. When she disclosed that abuse, her mother failed to protect her or intervene.  Ms. Claudio grew up without meaningful contact with her extended family, whom Christian later described as a source of shame and fear rather than safety.  This unaddressed trauma shaped her adult relationships and her capacity to protect her own children.

Ms. Claudio met Christian's father, Ruben Lugo, in the mid-1980s.  By that time, she already had a daughter, Tiffany Newby.  She and Mr. Lugo married and had three children together, with Christian as their firstborn.  While Ms. Claudio maintained steady employment

---

[2] Roberts, Nicole F., 5 Ways Trauma And Poverty Affect Childhood Development, Forbes, 7 October 2020, https://www.forbes.com/sites/nicolefisher/2020/10/07/5-ways-trauma-and-poverty-affect-childhood-development/

[3] The information provided in this sentencing memorandum was the result of an extensive mitigation investigation, conducted by Ms. Louise Luck, mitigation specialist appointed to this matter, which was compiled in a Social History Report, attached hereto as Exhibit 1.  The investigation included conversations with Christian Lugo's friends, family members and others who Christian has known throughout his life.

for decades, the marriage itself was volatile.  Mr. Lugo struggled with long-term alcoholism, engaged in criminal conduct, and was frequently violent.  Ms. Claudio described episodes in which he physically struck both her and the children, destroyed household property in fits of rage, and created an atmosphere of fear inside the home.  On at least one occasion, the violence led to his arrest and incarceration, and a court ultimately barred him from returning to the household.

Christian's father acknowledges much of this history.  He describes his past with evident pain and regret, conceding that alcoholism dominated his life during Christian's childhood and that he failed in his role as a parent during those years.  While Mr. Lugo later achieved sobriety and became a minister, that transformation occurred only after Christian's most formative years had passed.

## CHRISTIAN'S CHILDHOOD: VIOLENCE, ILLNESS, AND EARLY DISPLACEMENT

Christian's early childhood was shaped not only by family violence but also by physical vulnerability.  He suffered from asthma and was frequently hospitalized, adding another layer of fragility to an already unstable environment.  Despite these challenges, multiple accounts describe him as a gentle, affectionate child who cared deeply for his siblings, disliked conflict, and gravitated toward sports and school.  He played football, basketball, and baseball, and for a time, did well academically.  That promise was steadily eroded by the chaos surrounding him.  Mr. Lugo, Christian's father was a drug dealer, who was physically abusive to Christian and his siblings.  Fear was instilled rather than guidance.  Christian learned early that adults could not be relied upon to provide safety or consistency.  Family members described Christian's childhood as marked by pervasive violence and instability.  Mr. Lugo was physically abusive, striking the children and engaging in explosive, destructive behavior in the home, including

6

ripping phones from the wall and smashing household objects. Both parents placed the children in chronically unsafe situations, exposing them to violence and adult dysfunction rather than protection. Christian and his siblings grew up in an environment devoid of stability or safety, one that a close family member later described as consistently unhealthy and damaging, with no period of childhood that could be recalled as secure or nurturing.

The parental separation, which occurred when Christian was approximately ten years old, did not bring stability. Instead, it introduced new disruption. After Mr. Lugo and Ms. Claudio separated, Mr. Lugo moved out of the family home and began living with an eighteen-year-old woman. Christian and his siblings were shuttled between parents, often returning from visits with their father angry, frightened, and unsettled by what they had witnessed. Christian, whom his mother called "Coco," absorbed the conflict acutely. Even as a child, he was sensitive to violence and distressed by its impact on those around him. During visits with their father, Christian and his siblings were exposed to behavior that their mother later described as inappropriate and disturbing. When the children returned home, Christian reported being upset by what he had witnessed, prompting Ms. Claudio to repeatedly ask Mr. Lugo not to engage in such conduct in front of the children.

Not long after the separation Ms. Claudio married Anthony Cruio and had additional children. That relationship proved deeply harmful to Christian and his siblings. After Ms. Claudio married Anthony Cruio, family life continued to deteriorate. Tiffany Newby described her mother's relationship with Cruio as deeply harmful, explaining that after he entered the household, she and her siblings were pushed out of the home. She attributed responsibility to both parents and described Cruio as exploitative and abusive, creating an environment that ultimately displaced the children. For Christian, that instability reached a breaking point when

he was thirteen.  Following escalating conflict with his stepfather and his mother's refusal to intervene, Christian was expelled from the household and became functionally homeless.

Christian describes sleeping on the streets, in parks, abandoned cars, and wherever temporary refuge could be found.  He scavenged for food, sometimes eating from garbage cans.  During summers, he washed himself in strangers' swimming pools when he could.  This was not a brief episode of displacement.  Christian considers himself essentially homeless from early adolescence until his mid-twenties.

### EDUCATION AND UNMET DEVELOPMENTAL NEEDS

Christian's educational history reflects both his underlying potential and the extent to which it went unsupported.  Raised primarily in Yonkers, he briefly lived with his father in the Dominican Republic during adolescence, where he attended school and earned passing grades.  Upon returning to New York, he enrolled at Charles E. Gorton High School.

School records document that Christian was likable, motivated, and capable.  He had an Individualized Education Plan for a learning disability, identified just before one of his school transfers.  Evaluations noted impulsivity, distractibility, and difficulty with organization—traits that worsened under stress—but also highlighted his strengths in mathematics, hands-on learning, and classroom engagement when structure was present.

Critically, educators observed that his academic struggles were closely tied to external crises affecting his attendance and emotional regulation.  He was recommended for counseling services, but consistent follow-through proved impossible as his housing and family situation collapsed.  Christian ultimately left school during his junior year, not because of a lack of aspiration, but because the conditions necessary for success no longer existed.

### FAMILY, RESPONSIBILITY, AND IDENTITY

Christian Lugo's transition into adulthood was marked by an early and sustained assumption of responsibility, particularly within the context of family life.  At 17 years old, he met Erica Molina, who was then sixteen and nearing the end of her first pregnancy.  Although Erica and the child's biological father were never together, Christian stepped into her life shortly after the birth of her son, in May 2008.  Within weeks, their relationship became one of shared responsibility and mutual support.

As Erica pursued higher education, enrolling in community college that same year, Christian assumed a caregiving role, regularly caring for Erica's son while also working.  This arrangement allowed Erica to attend school and laid the foundation for a close, nurturing bond between Christian and the child from infancy.  From the outset, Christian treated Erica's son as his own, a pattern that would define his approach to fatherhood in the years that followed.

Christian and Erica's early adult years were marked by instability, much of it rooted in Christian's own lack of housing and family support.  He moved frequently, sometimes staying with friends, sometimes renting rooms in unsafe or overcrowded conditions.  During this period, Christian also spent time in the Dominican Republic with his father, who was then still struggling with alcoholism.  Erica recalled that there was often no stable adult figure capable of offering guidance or structure to Christian during these years.

Despite these challenges, Christian remained emotionally invested in his growing family.  When Erica became pregnant again, he attended prenatal appointments, helped prepare for the birth, and expressed genuine excitement about becoming a father.  Their daughter was born in May 2009.  Even as housing and employment remained precarious, Christian worked consistently—initially as a plumber and later in other trades—to support his family.

Over the next several years, Christian and Erica welcomed two more children, in 2013 and 2016.  Throughout this period, Erica described Christian as a hard worker and a deeply involved parent.  Even when money was tight, he ensured that the children's basic needs were met and treated all of them equally.  His commitment to keeping the family together reflected a conscious determination not to repeat the abandonment and instability of his own childhood.

Christian's relationship was not without challenges.  They were young, under stress, and at times struggled with trust and stability.  But Erica consistently described Christian as generous, emotionally present, and deeply invested in his children's lives.  He attended school events, paid for extracurricular activities, and actively participated in parenting decisions.  His aspirations for his children were explicit: that they finish school, attend college, and build lives free from the instability he endured.  He spoke often about moving his family out of the Bronx and into a safer, more stable environment, a goal he pursued even after their separation in early 2023.

Multiple people described Christian as community-minded and giving, particularly once he began working in the towing business.  He organized holiday events, provided food and supplies to families and children in the neighborhood, helped homeless individuals with shelter and small jobs, and distributed school backpacks filled with supplies.  These acts were not performative; they were consistent with how Christian understood responsibility—to family first, but also to others in need.

Cynthia Concepcion, who later became closely involved in Christian's life, corroborated these accounts.  She described Christian as a provider not only for his own children but also for hers, as someone who routinely gave financial and emotional support without expectation of return.  She recounted multiple instances in which Christian went out of

his way to help vulnerable individuals, including spending significant sums to clothe and assist her struggling brother.  Cynthia also emphasized Christian's devotion to his children, their closeness to him, and the emotional toll his incarceration has taken on them.

Together, these accounts reflect a consistent theme: despite a childhood defined by abandonment and violence, Christian sought to create stability, connection, and protection for his children and those around him.  Fatherhood was not incidental to his identity; it was central to it.  While his life was marked by anxiety, pressure, and flawed decision-making, his efforts to build and sustain family bonds represent one of the clearest counterweights to the instability of his early years.

## II. <u>OFFENSE CONDUCT</u>

Defense counsel have consistently maintained that the conduct described in the Presentence Report does not reflect a typical criminal conspiracy characterized by sustained violence, territorial control, or participation in an organized street gang.  Christian was not a member of a violent gang, nor did he routinely engage in acts of violence as part of an ongoing criminal lifestyle.  Rather, the conduct at issue arose from a discreet and escalating business dispute between competing tow and auto-repair operations.  Certified Auto, the entity Christian owned and operated, functioned as a commercial enterprise, not a criminal street organization, and the conspiracy attributed to Christian was not one defined by regular acts of violence, weapons use, or a culture of intimidation.

The tragic events of February 7, 2022, occurred in the context of that dispute and represent a catastrophic failure of judgment rather than the culmination of a pattern of violent conduct.  While Christian is properly held accountable for allowing a confrontation to occur that carried foreseeable risk, the record does not reflect that he personally carried out violence

or that he orchestrated an ongoing campaign of armed enforcement.  The use of a firearm by a coconspirator was not part of a recurring practice but a singular, devastating escalation—one that resulted in the death of Gloria Ortiz and serious injury to others.[4]  That loss stands at the center of this case, but it should not obscure the distinction between a one-time, tragic convergence of poor decisions and the sustained violence typically associated with racketeering enterprises.

This distinction matters for sentencing.  18 U.S.C. §3553(a) requires the Court to assess not only the statutory labels attached to an offense, but the actual nature and circumstances of the conduct and the defendant's role within it.  Here, Christian's culpability lies in permitting a confrontation that should never have occurred—not in leading a violent gang or routinely participating in criminal violence.  Recognizing that difference does not minimize the harm caused; it ensures that the sentence imposed reflects the reality of the offense rather than its most extreme characterization.

Further, Christian also engaged in mail and wire fraud in connection with the operation of Certified Auto, resulting in an attributable loss of approximately $264,000.  That conduct was unlawful and warrants punishment.  At the same time, the fraud was economic in nature and did not involve violence, threats, or coercion, nor was it part of a broader scheme to control territory or intimidate competitors.  Rather, it arose from improper billing practices within a commercial towing and auto-repair business.  Recognizing this distinction permits the Court to account fully for the fraud while avoiding the conflation of non-violent financial misconduct with the sustained, organized violence typically associated with racketeering enterprises.

---

[4] The shooting occurred in front of Certified Auto where armed members of a rival auto shop congregated there hours after they perpetrated violence against a driver for Certified Auto.

**JUDICIARY SENTENCING INFORMATION (JSIN) AND NATIONAL SENTENCING PRACTICES**

In evaluating the factors set forth in 18 U.S.C. § 3553(a), courts are expressly directed to impose individualized sentences and to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct.  One source of comparative information frequently consulted in this analysis is the Judiciary Sentencing Information (JSIN) database maintained by the United States Sentencing Commission.  Notably, JSIN data reflects that approximately 27 percent of similarly situated defendants received a downward departure or variance, underscoring how frequently courts exercise discretion to tailor sentences based on individualized circumstances—even within the most severe guideline frameworks.  That practice is consistent with Congress's directive that sentencing be driven not by labels or statistical medians, but by careful attention to the defendant's role, background, and conduct.

Here, the parties have stipulated that the applicable Guidelines range is 240 months' imprisonment, based on a final offense level of 43 and a Criminal History Category III.[5] Within that framework, JSIN data compiled by the Sentencing Commission for Fiscal Years 2020 through 2024 reflects sentencing outcomes for thirty-nine defendants nationwide whose primary guideline was U.S.S.G. § 2A1.1, who were convicted of at least one count under 18 U.S.C. § 924(c), and who—like Christian —had a Final Offense Level of 43 and a Criminal History Category of I, excluding those who received a § 5K1.1 substantial-assistance departure. All defendants in this cohort received terms of imprisonment.  The average sentence imposed

---

[5] The parties stipulated to a Criminal History Category III.  However, according to Probation, Aggravated Unlicensed Operation of a Motor Vehicle in the First Degree is similar to driving with a suspended or revoked license convictions; as such, pursuant to USSG § 4A1.2(c)(1), no criminal history points were calculated.  See PSR at ¶121.  Defense counsel agrees with Probation's determination of the Criminal History Category and the basis for that determination. Although the parties are bound by the terms of the plea agreement, the Court retains full discretion to determine the correct Guidelines calculation and is not constrained by the parties' estimate.  See *United States v. Hamdi*, 432 F.3d 115 (2d Cir. 2005).  Notably, the applicable Guidelines range is 240 months irrespective of whether the Criminal History Category is I or III.

was 447 months, with a median sentence of 470 months. These figures describe the outer contours of national sentencing outcomes over the past five fiscal years.

Importantly, however, Christian does not resemble the average or median defendant in this cohort. His conduct did not arise from sustained participation in a violent criminal organization, nor does his history reflect routine or repeated acts of violence; instead, his culpability stems from a discrete, catastrophic escalation in the context of a business dispute— an individualized circumstance that § 3553(a) expressly requires the Court to weigh. The JSIN data provides context for the Court's analysis, while leaving sentencing discretion entirely with the Court. Ultimately, the Court's obligation is not to replicate national averages, but to impose a sentence that is sufficient, but not greater than necessary, in light of the actual nature of the offense and the history and characteristics of the person being sentenced.

### III. CONDITIONS OF CONFINEMENT

With respect to MDC Brooklyn, the Hon. Jesse M. Furman has noted that:

> [I]nmates at the MDC spend an inordinate amount of time on "lockdown" — that is, locked in their cells, prohibited from leaving for visits, calls, showers, classes, or exercise. (In Orwellian fashion, the Bureau of Prisons does not refer to these periods as "lockdowns"; instead, it refers to them as "modified operations." See Bureau of Prisons, Annual PREA Report CY 2022 (2023), at 1-2. But there is no mistaking what the practice entails.)…the MDC's physical conditions have long been problematic. See generally Order, United States v. Espinal, No. 11-CR-537 (JMA) (CLP) (E.D.N.Y. Oct. 17, 2016), ECF No. 39 (collecting "letters relating to the conditions at the Metropolitan Detention Center," which reported visible mold on walls and ceilings, contaminated drinking water, vermin infestation, mouse droppings falling through HVAC vents, and roaches and flies in showers)

See *United States v. Gustavo Chavez*, 22 Cr. 303, JMF (Opinion and Order). In June 2024, the TV and online news outlet NY1 obtained never-before-seen videos[6] from inside the jail showing cockroaches on the food served to the inmates, broken light fixtures and moldy showers. The

---

[6] https://ny1.com/nyc/all-boroughs/politics/2024/06/24/brooklyn-federal-jail-murder-conditions

same report quotes an inmate describing knives as long as nine inches made of metal ripped out

of the walls, and how there are stabbings at least a couple of times a week at the jail.  On July 17,

2024, three men were alleged to have murdered fellow inmate Edwin Cordero using makeshift

knives.[7]  The following month, in August 2024, an inmate was stabbed in the spine with an

icepick, "leaving the icepick protruding from the inmate's back," according to a DOJ press

release.[8]  There have been fights between inmates and also attacks on the COs as well while

Christian has been incarcerated.  During his pretrial detention Christian witnessed numerous

stabbings including one in which the victim was stabbed more than twenty-five times.

The result of these incidents is often a series of lockdowns and restrictions, making for

even harsher conditions of confinement.  In October 2024, there were shortages of water for

drinking, showering and flushing.  During a multi-agency operation that month, every unit in the

jail shut down, so no inmate workers were working in the kitchen, which meant that no meals got

distributed.  As a solution to this problem, the officers were handing crackers out to the inmates.

Inmates had access to the commissary, but most of those food items come in powder or dry form

and need water to be prepared.

Additionally, while incarcerated at the MDC, Christian was subjected to sexual

harassment by a correctional officer assigned to a therapeutic program.  According to the

mitigation report, the officer made inappropriate sexual advances toward Christian, including

unwanted physical contact, coercive propositions, and implicit threats of retaliation if Christian

reported the conduct.  These events caused significant distress and exacerbated Christian's

---

[7]https://www.justice.gov/opa/pr/federal-charges-announced-against-inmates-violent-crimes-committed-metropolitan-detention

[8]https://www.justice.gov/opa/pr/federal-charges-announced-against-inmates-violent-crimes-committed-metropolitan-detention

existing anxiety and depression, leading to his placement in the mental health unit for evaluation and support.  Despite this experience—and the broader, well-documented conditions at MDC—Christian did not retaliate, withdraw, or abandon his efforts at self-improvement.  Instead, he continued to engage in counseling, maintain institutional employment, and use his limited agency to support others in custody.  This episode underscores both Christian's vulnerability within the custodial environment and his capacity to respond to adversity with restraint rather than violence.

We ask that this Court factor this into its sentencing decision.

## IV. <u>REDEMPTION</u>

Christian will live with the consequences of his actions for the rest of his life. Nothing this Court does can restore what was lost on February 7, 2022, or ease the enduring grief suffered by the family of Gloria Ortiz. Christian does not dispute that reality.  He carries it with him daily — in memory, in remorse, and in the quiet reckoning that accompanies confinement. Accountability is unavoidable, and he accepts it.

But Christian Lugo is more than the worst decision of his life.  He is a man shaped by early abandonment, violence, and prolonged homelessness, who nevertheless sought to build stability where none was given to him.  Christian became a devoted father, a provider, and a source of care for others.  Even in custody, under harsh and demoralizing conditions, he has chosen work over idleness, service over withdrawal, and responsibility over despair.  He has sought counseling, led others toward restraint and reflection, and acted decisively to preserve life when faced with another's crisis.  These are not the actions of a man indifferent to human life.

Punishment untethered from mercy can become unnecessarily harsh; mercy untethered from accountability can undermine the rule of law.  A sentence that is sufficient, but not greater than necessary, reconciles both.  It recognizes the seriousness of the offense while acknowledging the human being who stands before the Court—one capable of growth, accountability, and moral repair, even within the confines of his pretrial detention.

For these reasons, and for those set forth throughout this memorandum, Christian respectfully asks the Court to impose a sentence that reflects justice with proportion, punishment with purpose, and accountability with the possibility—however distant—of redemption.

Respectfully,

/s/
Karloff C. Commissiong, Esq.
Stephen Turano, Esq.
*Attorneys for Christian Lugo*

cc:    A.U.S.A. Michael Herman (via ECF and email)
       A.U.S.A. Ni Qian (via ECF and email)
       A.U.S.A. Andrew Jones (via ECF and email)