

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

January 29, 2026

**BY ECF**

The Honorable Dale E. Ho
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

> Re:     *United States v. Christian Lugo*, 24 Cr. 606 (DEH)

Dear Judge Ho:

Defendant Christian Lugo was the leader of a criminal enterprise that corrupted the operations of an auto repair and tow truck shop known as Certified Auto that sought to control its territory in the Bronx through violence and fear while defrauding its customers and insurance companies of their money. And on February 7, 2022, Lugo, faced with a dispute between his enterprise and its rivals, allowed and encouraged a subordinate member of Certified Auto to discharge a firearm at the rivals, which resulted in the senseless murder of Gloria Ortiz and the non-fatal gunshot wounds to two other people.

Lugo's leadership in the racketeering enterprise, the violent nature of Lugo's admitted criminal conduct, and his criminal history would ordinarily warrant a sentence close to or at the statutory maximum sentence of life imprisonment. But, as described below, based on the unique circumstances of this case, and Lugo's history and characteristics, the Government concurs with the recommendation of the U.S. Probation Office and respectfully requests that the Court impose an aggregate sentence of 25 years' imprisonment.

I.  **Offense Conduct**

Since at least 2019 until February 2022, Lugo controlled the Certified Auto tow truck / auto repair shop located in the Bronx. (PSR ¶ 7). Lugo, through Certified Auto, made money by committing various types of insurance fraud on the cars that were towed to Certified Auto and would compete with other tow-truck/auto-repair companies for business. (*Id.*). In particular, starting in or about 2019, Lugo was in a dispute with another auto repair and tow truck company located nearby in the Bronx called "First Choice." (*Id.*) In or about 2021, the owner of First Choice was murdered in connection with a towing dispute and his wife, Gloria Ortiz, took over the business. (*Id.*)

In 2022, Ortiz and Lugo continued their rivalry over tow business in the Bronx, which ultimately resulted in the February 7, 2022 murder of Ortiz and non-fatal injuries to the two other victims.

## A.  Lugo's Corruption of the Certified Auto Tow Truck Shop

When cars get into auto crashes in the Bronx, the drivers will typically call 911 to report the incident.  (*Id.* ¶ 8).  If the cars are too damaged, they will need to be towed to an auto repair shop.  Legitimate tow truck shops will employ registered and insured tow trucks who will be dispatched by a dispatcher based on a variety of legitimate factors such as proximity to the accident.  (*Id.*).  Lugo, however, employed drivers who operated unlicensed pickup trucks that had hidden tow truck machinery underneath the pickup trucks.  They operated as so-called "chasers" who monitored police radios for car accidents and raced to the scenes of accidents—before any larger, and therefore slower, legitimate tow trucks could arrive—to attempt to convince the car's occupant to tow the damaged vehicle to Certified Auto.  (*Id.*).

Once towed to a repair shop, a legitimate repair shop will assess the repairs and put in the claim to the insurance company either for repairs or for total destruction.  (*Id.* ¶ 9).  The insurance companies will typically pay out the claim directly to the auto repair company, who will then also charge the customer a deductible.  (*Id.*)

Lugo and his subordinates at Certified Auto, however, made money at their tow truck by committing brazen frauds.  For example, Lugo would often take money from insurance companies to repair cars that were towed to Certified Auto and then simply not repair the cars at all.  (PSR ¶ 10).  Even when customers came to complain, Lugo would ignore the customers, keep the cars at the shop, and then later seek title for the cars as abandoned.  (*Id.*).[1]

Other times, Lugo and his conspirators would damage a car more than had occurred at the car accident to increase the cost of the repairs, or sell new parts and report to the insurer that they were stolen.  (PSR ¶ 11).  Lugo also made money by overcharging insurance companies for repairs that may or may not have been performed.  (*Id.*)  At times, Lugo would pay the insurance adjusters bribes so that they would write up the paperwork for more damage than had occurred.  (*Id.*).

Finally, Lugo also made money by referring individuals involved in car accidents to physical therapists, regardless of whether they were actually injured, and often in return for a kickback.  (PSR ¶ 12).

Because of the various frauds that Lugo perpetrated through the Certified Auto enterprise, each car that was successfully towed to the shop was very valuable—often bringing in tens of thousands of dollars in fraud proceeds per car.  (PSR ¶ 13). As a result, Lugo often had disputes with other shops operating in the same area over the right to tow certain cars in Certified Auto's claimed territory, which often rose to acts of violence. For example, tow truck drivers from rival

---

[1] Because small claims court was the only option for these customers to reclaim their damaged cars, Lugo appeared to ignore being sued in small claims court because the shop was in the name of the mother of Lugo's children.  (PSR ¶ 10).

shops sometimes showed up to the same accident scene and the tow truck drivers threatened violence until one of them backed down. As a result, Lugo's tow truck drivers often possessed and brandished firearms during these disputes. (*Id.*)

In particular, Lugo, whose shop was in the 40th NYPD police precinct, had a rivalry with another shop in the adjacent 41st NYPD Precinct called "First Choice," which, as discussed above, was operated by murder victim Gloria Ortiz and her workers. Certified Auto claimed the 40th precinct as its territory, while First Choice claimed the 41st precinct. As the below map of upper Manhattan and Bronx police precincts shows, these two police precincts were right next to each other, and the two police precincts also shared the same police radio channel. Because the shops tended to find accidents via police radios, Certified Auto and First Choice clashed often as they attempted to "chase" car accidents in similar territories.



### B. Lugo Allows and Agrees that CC-1 Engage in an Armed Confrontation Knowing that CC-1 would Shoot, Resulting in the February 7, 2022 Murder of Ortiz

On February 7, 2022, one of Lugo's tow truck drivers ("Driver-1") got into a minor car accident while driving one of Lugo's pickup trucks (illegally used as a tow truck) with a passenger vehicle in the 41st NYPD police precinct—that is, in First Choice's territory, not in Certified Auto's territory. (PSR ¶ 15). Neither Driver-1's pickup truck nor the car were seriously damaged. A screenshot of the aftermath of this accident is included below, and the video of it is attached hereto as Exhibit A[2]:

---

[2] Exhibit A and the other video exhibits referenced in this submission are being provided to the Court electronically.



Despite the car accident occurring in First Choice's claimed territory, Driver-1 persuaded the driver of the passenger vehicle to take his damaged car to Certified Auto. (*Id.*) Members of First Choice arrived at the scene and observed that Driver-1 had persuaded the driver of the passenger car to have his car repaired at Certified Auto despite the accident taking place in First Choice's claimed territory. (*Id.*) After a confrontation with Driver-1 about their respective towing territory, the First Choice members then violently assaulted Driver-1 who eventually managed to flee and inform Lugo what had happened. (*Id.*). A video clip of First Choice members chasing after and attacking Driver-1 is attached hereto as Exhibit B.

Lugo then contacted another subordinate member of Certified Auto ("CC-1") to pick up Driver-1 after which they all met up with Lugo. (PSR ¶ 16). At that meeting, they discussed the assault on Driver-1 by First Choice members and Lugo allowed an armed confrontation to occur with respect to the First Choice members that Lugo knew could lead to serious harm or death. (*Id.*). Specifically, during that conversation, Lugo told CC-1 "are you going to take care of it or am I?" and CC-1 stated that CC-1 would do so. (*Id.*) Lugo knew that CC-1 possessed and intended to discharge a firearm at First Choice members who had assaulted Driver-1, including a particular member of First Choice ("Victim-1") who was believed to have been the one who assaulted Driver-1, in order to further the Certified Auto criminal enterprise. (*Id.*) CC-1, armed, then drove to Certified Auto, where Ortiz, Victim-1, and other members of First Choice had gathered including another member of First Choice ("Victim-2"), in an apparent attempt to confront Certified Auto members about the incident involving Driver-1. (*Id.*) These First Choice members were congregated outside Certified Auto, as Certified Auto's gate was closed, and had arrived in multiple vehicles, including multiple converted pickup trucks that First Choice used as illegal tow trucks, just as Certified Auto did. A video clip of First Choice members arriving nearby Certified Auto, exiting their vehicles, and walking towards Certified Auto is attached hereto as Exhibit C.

At least some of the First Choice members, including Victim-1, were armed. (PSR ¶ 16). When CC-1 arrived in a white car, CC-1 drove by, firing into the crowd towards Victim-1, but instead hit and killed Ortiz, struck Victim-2 in the back, and struck a bystander who was

unaffiliated with First Choice ("Victim-3") in the shoulder. (*Id.*)  Victim-1 was unharmed and returned fire with his gun, as did another member of First Choice. (*Id.*).  A video clip showing the shooting which in which CC-1 shot, killing Ortiz and injuring the other victims, while Victim-1 and another person shot back is attached hereto as Exhibit D.

After the murder, Lugo admittedly relocated to Florida (closing Certified Auto) where he remained until 2024 whereupon he resumed working in the tow truck industry. (PSR ¶ 17).  After the murder, members of First Choice took over the Certified Auto location and established their own tow truck shop.

### C.   The Indictment and Lugo's Arrest

On October 17, 2024, the Grand Jury returned the Indictment (Dkt. 2), charging Lugo with the following offenses in six Counts:

| Count | Statute (18 U.S.C. § ) | Description |
|---|---|---|
| 1 | 1962(d) | Participating in a racketeering conspiracy relating to Lugo's leadership of the Certified Auto criminal enterprise. |
| 2 | 1959(a)(5) | Murder and assault with a dangerous weapon in aid of racketeering, relating to Lugo's participation in the murder of Gloria Ortiz on or about February 7, 2022. |
| 3 | 1959(a)(1) and (a)(3) | Conspiracy to commit murder in aid of racketeering, relating to Lugo's participation in a conspiracy to murder a member of a rival tow truck company on or about February 7, 2022, which resulted in the murder of Gloria Ortiz. |
| 4 | 1959(a)(3), (a)(5) | Attempted murder and assault with a dangerous weapon in aid of racketeering, relating to Lugo's participation in the non-fatal shootings of Victim-1, Victim-2 and Victim-3. |
| 5 | 924(c)(1)(A)(i), (ii), (iii), and 2 | Use, carrying, brandishing, and discharging a firearm, and aiding and abetting the same, during and in relation to the crime of violence charged in Count Two. |
| 6 | 924(c)(1)(A)(i), (ii), (iii), and 2 | Use, carrying, brandishing, and discharging a firearm, and aiding and abetting the same, during and in relation to the crime of violence charged in Count Four. |

Law enforcement agents arrested Lugo on October 22, 2024, in his apartment in the Bronx. During the resulting search of Lugo's apartment, agents recovered, among other things, a single live round of ammunition.

### D.  The Guilty Plea and the Applicable Guidelines Calculation

On August 21, 2025, Lugo pled guilty, pursuant to a plea agreement, before this Court to Count One (racketeering conspiracy) and the lesser-included charge counted in Count Five (use, carrying, and possession of a firearm).  In doing so, Lugo admitted to his role in the murder of Gloria Ortiz, including by "permitting CC-1 to retaliate" against First Choice members by violence and his discharging a firearm, resulting in Ortiz's death.  (PSR ¶ 23).

The parties in the plea agreement, and the Probation Office, agree that the applicable Guidelines adjusted offense level for Count One is 43, accounting for Lugo's role in the shooting and frauds, his leadership in the criminal enterprise, and his acceptance of responsibility.  (*See* PSR ¶¶ 29-55).

The parties in the plea agreement and the Probation Office calculate Lugo's criminal history score differently, largely based on whether Lugo's three prior convictions for aggravated unlicensed operation of a motor vehicle in the third degree garner criminal history points. [3] Regardless of Lugo's criminal history category, the advisory Guidelines sentence for Count One would be life imprisonment.  However, because the statutorily authorized maximum sentence of 240 months' imprisonment is less than the maximum of the applicable Guidelines sentence, pursuant to U.S.S.G. § 5G1.1(c), the applicable Guidelines sentence for Count One is 240 months' imprisonment.  (PSR ¶ 119).  The applicable Guidelines sentence, and mandatory consecutive minimum sentence, for Count Five is 60 months' imprisonment.  (*Id.*).

Accordingly, Lugo's total applicable Guidelines sentence, to which all parties and the Probation Office agree, is 300 months'—or 25 years'—imprisonment, 60 months of which must run consecutively to any other sentence.  (PSR ¶ 119; *id.* at p. 32).

---

[3] The Government believes that these convictions properly garner criminal history points.  *See, e.g.*, *United States v. Behr*, 2006 WL 1586563, at *4 (S.D.N.Y. June 9, 2006) ("On March 3, 2000, Behr was arrested for false impersonation and aggravated unlicensed operation of a motor vehicle in the third degree, offenses which result in one criminal history point."); *United States v. Martinez*, 953 F. Supp. 2d 514, 523 (S.D.N.Y. 2013) (recognizing criminal history points were added for these offenses).  However, this Court need not reach the issue because the criminal history calculation does not affect the applicable Guidelines-recommended sentence.  *See United States v. Borrego*, 388 F.3d 66, 70 (2d Cir. 2004) (A "court is not obliged to waste its time making [Guidelines] findings that would have no effect on the sentence."); *United States v. Tracy*, 12 F.3d 1186, 1203 (2d Cir. 1993) (when a sentencing dispute has no bearing on the determination of a sentence, courts need not rule on disputed offense level adjustments).

## II.  Discussion

### A.  Legal Standard

As the Court is well aware, the Guidelines continue to provide guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, the Court must consider the seven factors outlined in 18 U.S.C. § 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* at 50 & n.6. To the extent the Court imposes a sentence outside the Guidelines range, it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*) (quoting *Gall*, 552 U.S. at 46).

### B.  The Probation Office's Sentencing Position

The Probation Office, like the Government, recommends an aggregate sentence of 25 years' imprisonment. (PSR at p. 32). In formulating its recommendation, the Probation Office writes that the 300-month sentence was important to "general deterrence, specific deterrence, just punishment, respect for the law, and most importantly to protect the community by means of incapacitation." (*Id.* at p. 33).

### C.  The Court Should Sentence the Defendant to 25 Years' Imprisonment.

The Guidelines sentence of 300 months' imprisonment is sufficient but not greater than necessary, considering (i) the serious nature of the instant offense and the need to promote respect for the law, (ii) the need for general deterrence, and (iii) the need to protect the public and to afford adequate deterrence of future criminal conduct. Such a sentence appropriately balances the Section 3553(a) factors including by accounting for Lugo's leadership role in the charged racketeering conspiracy and his indispensable role in the murder of Ortiz and the injuries to the other victims. His criminal conduct, standing alone, demand a sentence that will incapacitate him for a substantial period of time, maybe even up to the statutory maximum of life imprisonment. But in recognition of certain mitigating facts presented by the defense, the Government allowed Lugo to plead guilty to offenses that carry a Guidelines sentence of 25 years' imprisonment. The Government respectfully submits that the Guidelines sentence is the appropriate sentence for this matter.

Lugo's brazen conduct in setting in motion, and in allowing, a violent confrontation outside of his criminal enterprise's shop resulted in the most violent and tragic consequences: the death of Gloria Ortiz, a 39-year old mother of three, which left her children as orphans. (*See* PSR ¶ 19). That shooting occurred as a predictable consequence of Lugo's leadership in the Certified Auto enterprise, that tried to dominate his territory through violence and fear.

For years, Lugo operated Certified Auto as a criminal enterprise. He used the veneer of an auto repair shop to hide a multi-faceted fraud scheme that took money from insurance companies and stole cars from ordinary residents who were unlucky enough to have gotten into an accident in his part of the Bronx. To further his scams and potentially scare off competitors and disgruntled customers, Lugo cultivated a reputation for violence, and he hired people with guns to work at his shop. To protect this lucrative fraud factory, Lugo used violence and threats of violence. Lugo was not alone in this industry. But rather than trying to quell the violent rivalry with competitors, Lugo actively escalated it. Violence and fraud went hand in hand in Lugo's criminal enterprise.

On the day of the murder, it was Lugo who called CC-1—known for being armed—to come to meet with him and ultimately set in motion CC-1 going to the Certified Auto shop. Lugo knew that Gloria Ortiz, the victim, and the other members of First Choice were in front of the shop. It was Lugo who egged on CC-1, asking him whether CC-1 was going to "take care of it" or whether Lugo would have do it. Lugo's question implicitly challenged CC-1 to step up for their criminal enterprise and it also indicates that Lugo had been willing to do the shooting instead of CC-1. Lugo was not a passive onlooker. He was not in the wrong place at the wrong time. Lugo created the place and time by purposefully calling CC-1, Lugo's armed subordinate, to the shop with the intention of avenging Driver-1 and to protect Lugo's lucrative criminal enterprise. And as a direct result of Lugo's deliberate actions, a single mother to three children was killed, and two others were shot. A significant sentence is therefore warranted to provide just punishment, to reflect the seriousness of Lugo's conduct, and to achieve justice for the surviving members of Ortiz's family.

A significant sentence is also warranted to provide sufficient general and specific deterrence. As demonstrated just by the facts of this case, Lugo was not alone in the tow trucking industry who relied on violence and threats of violence to generate business. That is unacceptable. Furthermore, a significant sentence is necessary to send a message that leaders and organizers will be held to account when they trigger a series of events that lead predictably to violence.

## D. The Court Should Reject Lugo's Arguments for a Variance to 180 Months' Imprisonment

The Court should reject Lugo's arguments for a variance to 180 months' imprisonment. (Def. Subm. at 3). In the Government's view, it carefully considered the mitigating circumstances presented by Lugo in allowing him to plead to charges that reduced his exposure from life imprisonment to a Guidelines sentence of 25 years' imprisonment. No additional sentence reduction is warranted.

Lugo's primary argument for leniency centers on his difficult upbringing. (Def. Subm. At 6-8). While Lugo's difficult childhood is tragic in many ways, his conduct in this case perpetuated the destructive effects that plagued his own childhood. Rather than turn away from the destructive behavior Lugo claims to have experienced growing up, Lugo became the leader of a violent criminal enterprise that put others in the Bronx in danger, and caused the murder of Gloria Ortiz. Ultimately, in the Government's view, Lugo's upbringing cannot justify the harm he inflicted on others, including the permanent loss of Gloria Ortiz to her family, friends, and children.

The Court should also not provide Lugo with an additional sentencing reduction on account of the conditions of confinement at the MDC. (*See* Def. Sent Subm. 14-16). While the Court can and should take these circumstances into account in fashioning an appropriate sentence, MDC conditions cannot justify a significant variance from the applicable Guidelines sentence in view of the utmost serious nature of the offense—a murder—and the substantial reduction in sentencing exposure the defendant is already receiving.[4]

In any event, Lugo himself contributed to the disorder in the MDC by being part of a group of inmates who smuggled in a significant amount of contraband, including marijuana, tobacco, and cellphones, which have a significant negative effect inside the MDC. (*See* PSR ¶ 3). The sheer amount of contraband that Lugo attempted to smuggle into the MDC, along with others, was likely worth thousands of dollars.

In short, the Government has carefully considered the mitigating factors put forth by Lugo, and took them into consideration in plea negotiations, which resulted in Lugo's guidelines sentence being only 25 years. In the Government's view, no further reduction is warranted.

## III. <u>Conclusion</u>

Lugo was the leader of a criminal enterprise whose conduct ultimately resulted in a murder There is a great need to deter Lugo and achieve justice for the Ortiz family. The Government

---

[4] The conditions of confinement issues raised by Lugo in the Mitigation Report, if true, are unquestionably unacceptable. Nonetheless, we submit that the Guidelines sentence is appropriate in light of the extraordinarily serious nature of the offense conduct, and an appropriate remedy for Lugo's allegations may lay elsewhere. Moreover, while a number of courts in this District have previously found (primarily in mid to late 2024), that the conditions at MDC were in need of significant improvement, the MDC has over the past year since those decisions taken serious steps to address those issues and has steadily improved conditions, increasing staffing levels and addressing persistent medical issues. As Judge Caproni noted towards the end of 2024 after these decisions cited by Lugo came out, and the MDC had begun to address them, "MDC is improving every day." (24 MJ 4261 (UA) (VEC), Dec. 10, 2024 Tr. 15.). Even more recently Judge Caproni commented that "The horror stories from a year ago [at the MDC], it's not the same facility." (Transcript from January 16, 2025 appearance in *United States v. Alon Alexander et al.*, 24 Cr. 676 (VEC) at 125). Further, Lugo was not incarcerated at the MDC in 2020, 2021, or 2022, at the height of the COVID-19 pandemic where there were more frequent lockdowns and conditions were significantly worse. And even when defendants were incarcerated at the height of the pandemic, courts found that the conditions at the MDC did not warrant "significant Guidelines departure[s]" requested by defendants. *See United States v. Stewart*, No. 21 Cr. 42 (WFK), 2023 WL 2599668, at *7 (E.D.N.Y. Mar. 22, 2023); *see also, e.g.*, *United States v. Sanchez*, No. 01 Cr. 74-2 (PAC), 2022 WL 4298694, at *2 (S.D.N.Y. Sept. 19, 2022) (finding, in context of compassionate release motion, that "the difficult—but generalized—prison conditions during the COVID-19 pandemic" do not constitute extraordinary and compelling circumstances for a defendant's release); *United States v. Boynton*, No. 20 Cr. 43 (RPK), 2022 WL 7131927, at *1 (E.D.N.Y. Oct. 12, 2022) (collecting cases to same effect).

respectfully requests that the Court sentence the defendant to an aggregate term of 25 years' imprisonment, consistent with the Probation Office's recommendation, comprised of 20 years on Count One and five years on Count Five, to be imposed to run consecutively. This sentence appropriately balances the aggravating and mitigating circumstances, and is, respectfully, warranted here.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:    _____/s/_____
       Michael Herman / Ni Qian / Andrew Jones
       Assistant United States Attorneys
       (212) 637-2221 / - 2364 / -2249