UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 24 Cr. 606 (DEH)

CHRISTIAN LUGO,

Sentence

Defendant.

------------------------------x

New York, N.Y.
February 5, 2026
10:15 a.m.

Before:

HON. DALE E. HO,

District Judge

APPEARANCES

JAY CLAYTON
United States Attorney for the
Southern District of New York
MICHAEL HERMAN
NI QIAN
Assistant United States Attorneys

KARLOFF COMMISSIONG
STEPHEN TURANO
Attorneys for Defendant

(Case called)

MR. HERMAN: Good morning, your Honor. Michael Herman and Ni Qian for the government, and we're also joined by a number of special agents in the audience and the victim, Ms. Ortiz's son is joining us by telephone.

THE COURT: Good morning.

MR. COMMISSIONG: Good morning, your Honor. Karloff Commissiong and Stephen Turano on behalf of Mr. Lugo.

THE COURT: Good morning. Good morning Mr. Lugo.

MR. COMMISSIONG: Before we begin, may I have a moment to confer with the government?

THE COURT: Of course.

Everyone, please have a seat.

(Counsel conferred)

MR. COMMISSIONG: Your Honor, the issue is there was a mistake with respect to telling some of the family members who flew in from Florida what time the proceeding started. They are under the impression that it starts at 11:00. And we were trying to find out if it was all right with the government and of course with the Court if we could push this back a bit. Mr. Turano is trying to find out if they are on their way.

THE COURT: Okay. We also have the issue of a statement by a family member of one of the victims who is joining us on the phone today, Mr. Jacob Brito. And I understand he is quite far away and might have some limitations

on his time as well.

Let me check with the government first if there are any concerns or objections to taking a 45-minute recess before we proceed?

MR. HERMAN: Judge, unfortunately both of us have other appearances in court. I know my colleague has a plea, and I have something that is supposed to start right after 11:00-ish.

THE COURT: It might be hard to get to something at 11:00 anyway. I expect this not to be a, sort of, by-the-numbers extremely quick proceeding.

MR. HERMAN: Judge, I appreciate accommodating the defendant's family. I know some of his family is here. Some of his family I guess are on their way. At the end of the day, the Court set this time, and I think we should at least, if they are on their way then they can certainly be here when they get here.

THE COURT: My last comment wasn't about whether or not to proceed now or at 11:00. It was if you have something at 11:00, I'm not sure we'll be done.

MR. HERMAN: No, no, no, that's fine. If we were to start at 11:00, it might be an issue.

THE COURT: Okay. Do you have any sense of Mr. Brito's availability?

MR. HERMAN: No, your Honor.

THE COURT: All right. Mr. Commissiong, is there something you would like to add?

MR. TURANO: Judge, if I can. I'm trying to get the responses of who is coming and how far out they are. Some of the family members are here. But if there is an issue about accommodating a victim statement, is it possible we can take that when the person is available and then break it up, and take a 20 minute or half hour break?

THE COURT: I suspect Mr. Brito would like to listen to the proceedings in their entirety as well. Also, what I'm hearing from the government is if we start at 11:00, as you are requesting, they are not going to be able to make their appearances. There is also some noise in the hallway so perhaps the people you are expecting are here.

MR. HERMAN: Again, Judge, we appreciate the desire of the defendant's family to be present. They obviously have the statutory right to be present, but we always want to accommodate that. We would suggest perhaps we can get through any legal issues and maybe by that point they're here and they could certainly be here for the time that they're here and any time that after.

THE COURT: That's what I was about to say. I think if there were no issues with potential conflicts then I would be open to holding for another 45 minutes or so. But given the fact that we do have some potential conflicts and someone who

is on the phone from I believe another continent, I believe we ought to proceed. That being said, I don't think we are going to be finished by 11:00. So if people arrive by 11:00, I'm sure they will catch a substantial amount of the proceedings.

With that, I think let's proceed, unless there is anything else you would like to raise?

MR. COMMISSIONG: No, your Honor.

THE COURT: Let me give you all a roadmap of how I intend to proceed today. I'm going to start with preliminary issues going over what's been submitted to the Court in connection with sentencing and just confirming that the record is clear and accurate as to what the parties have submitted because there were a number of submissions.

I'll go over the sentencing guidelines calculation, and I know there was some discrepancy between how the PSR calculated Mr. Lugo's criminal history and how the parties did. So I want to address that.

And then I'll hear from the parties, including a statement from Mr. Brito, and after that I'll take a recess, probably about ten minutes and come back and pronounce the sentence.

Let's start with the preliminary matters. In preparation for today's sentencing I've reviewed the presentence report, dated November 25, 2025. I've also received a number of additional submissions from the defense.

The defendant's initial submission, dated January 16, 2026, as well as attachments to it, and supplemental submissions, dated January 26th, February 2nd, and February 4th, 2026, with the February 2nd submission filed in redacted form on the docket, but I have the un-redacted version. It's in the vault.

From the government I've received submissions dated January 29, 2026, as well as attachments to it, including videos that were provided directly to chambers, a supplemental submission, dated February 4, 2026, a victim impact statement, dated February 2, 2026.

First, I want to confirm that I've gotten everything here. Have I enumerated everything that the defense has submitted?

MR. COMMISSIONG: Yes, your Honor.

THE COURT: Thank you.

And have I enumerated everything that the government has submitted?

MR. HERMAN: Yes, your Honor.

THE COURT: Have the parties received each of these -- all of these submissions, I should say?

MR. HERMAN: We have, your Honor.

MR. COMMISSIONG: Yes, your Honor.

THE COURT: Are there any additional submissions at this time?

MR. HERMAN: No, your Honor.

MR. COMMISSIONG: No, your Honor.

THE COURT: Okay. And have all of these submissions been filed on ECF with the exception of the un-redacted victim impact statement from February 2nd?

MR. HERMAN: We have not yet filed a redacted victim impact statement, but we can certainly do so later today.

THE COURT: I'll direct you to do that. I think there is some information about minors in there that I've asked you all to redact.

And the defense submissions?

MR. COMMISSIONG: Yes, your Honor.

THE COURT: Okay. Thank you.

Before I go further, I just want to confirm that any and all identifiable victims have been notified of their rights under the Justice for All Act?

MR. HERMAN: Yes, your Honor.

THE COURT: And I received, as I noted, one written victim impact statement, and we have on the line the family member of one victim, Mr. Brito. I just want to confirm beyond those two, there are no other individuals who wish to provide a statement today?

MR. HERMAN: No, your Honor, no additional statements.

THE COURT: Thank you.

Let me turn now to the presentence report. Mr. Commissiong, I just want to confirm that you've read the

presentence report and discussed it with Mr. Lugo?

MR. COMMISSIONG: Yes, your Honor.

THE COURT: And Mr. Lugo, have you read the presentence report and had an opportunity to discuss it with your counsel?

THE DEFENDANT: Yes, sir.

THE COURT: Has the government reviewed the presentence report?

MR. HERMAN: Yes, your Honor.

THE COURT: Okay. I want to turn to the factual recitations in the presentence report. Let's put aside the sentencing guidelines calculation for a moment. I know there were a number of objections. And I just want to confirm whether or not all of those objections have been resolved satisfactorily, to the parties' satisfaction.

Let me start with the government. I know there were objections to Paragraphs 3, 41, 65, and 70. And probation indicated in the final report that they believe it accommodated those objections. Is that the government's view?

MR. HERMAN: It is, your Honor.

THE COURT: Turning to defense, I know there were sort of two buckets of objections with respect to the offense conduct in Paragraphs 5 through 7 and 14 through 17. And then second with respect to Mr. Lugo's characteristics in Paragraphs 74 to 76. Have those been resolved to defense's satisfaction?

MR. COMMISSIONG: Yes, your Honor.

THE COURT: No other objections to the factual recitations in the presentence report?

MR. COMMISSIONG: That's correct, Judge.

THE COURT: Okay. So hearing no current objections to the presentence report, I'll adopt the factual recitations set forth therein. The presentence report will be made part of the record in this case and placed under seal. If appeal is taken, counsel on appeal may have access to the sealed report without further application to the report.

I'll now turn to the sentencing guidelines calculation. As you are all aware, I'm not required to follow the United States sentencing guidelines, but I'm still required to consider the applicable sentencing guidelines range in imposing a sentence and therefore must accurately calculate that range. In this case you have a plea agreement to which the parties stipulated to a particular calculation of the sentencing guidelines. I just want to confirm that I'm correct that while there are some differences between -- there is a difference, I should say, between the criminal history calculation and the presentence report, and what the parties reached in the plea agreement, the ultimate guidelines calculation -- sentencing guidelines calculation in the presentence report is still, practically speaking, in accord with the agreement because the guidelines range, however it's

calculated, either under the presentence report, criminal history or the parties' criminal history, exceeds the statutory maximum sentence of 240 months on Count One and the guidelines range on Count Five remains a statutory mandatory minimum sentence of 60 months. So I just want to confirm my understanding there.

MR. HERMAN: Yes, your Honor. And pursuant to the case law, we cited in Footnote Three of our submission, because of that, the Court could make a finding as to the dispute but need not do so.

THE COURT: Okay. Mr. Commissiong, do you concur with that?

MR. COMMISSIONG: I concur, yes.

THE COURT: You concur with the guidelines calculation, in other words?

MR. COMMISSIONG: Yes.

THE COURT: Okay. All right. So I'm not going to resolve the discrepancy between the presentence report and the parties' calculations -- sorry, the parties' agreement as to Mr. Lugo's criminal history category. In light of the Second Circuit's decision in the *United States v. Borrego*, 388 F.3d 66 from 2004 and other decisions. I'll not address this issue because it would have no practical effect on the sentence.

Based on the parties' agreement, the absence of any objection, and my independent evaluation of the sentencing

guidelines, I accept the guidelines calculation of the parties of 300 months, incorporating all relevant guideline amendments. I find that the offense level is 42 and regardless of whether the criminal history category is I, as calculated in the PSR or III, as calculated by the parties, the guidelines range on Count One is 240 months or 20 years' imprisonment. On Count Five, the guidelines range is 60 months or five years' imprisonment which must run consecutively on any sentence imposed on Count One. And so, as I stated, the effective guidelines range in this case is 300 months which is 25 years.

With the guidelines calculation out of the way, I'll now turn to statements from the parties. I'll start with the government, and I'll turn then to Mr. Brito on the phone. And I'll turn to defense counsel and Mr. Lugo, if you'd like to make a statement, I'll give you that opportunity.

So I'll start with the government, and I'll just note for everyone that I've read and reviewed the submissions so there is no need to repeat in detail everything that's stated in them. But I'll give everyone as much time as you need to make whatever points that you want. So let me start with Mr. Herman.

MR. HERMAN: Thank you, your Honor.

I think I'd like to emphasize the context in which this horribly tragic shooting and murder occurred. This is perhaps a senseless violence, but it was a predictable

consequence of the RICO conspiracy of the tow truck industry in the Bronx. These criminal enterprises illegally batting for passenger cars, victimizing people for their money and cars, chasing after accidents in highly dangerous ways, often armed with guns, fighting over territory, and trying to beat the licensed tow trucks to an accident to claim a car and then trying to make tens of thousands of dollars in fraudulent proceeds.

That type of environment, which the investigation showed was widespread among both the defendant's enterprise and his rivals, is a recipe for disaster, and that's exactly what happened here. You have sort of a unique confluence of events where one of the defendant's workers driving his illegal tow truck in the opposing enterprise territory got into an accident in that pickup truck but convinced the passenger car to go to the defendant's shop. And that caused a series of events that ultimately led to this truly awful shooting that killed Gloria Ortiz and injured other people.

And I think it's important to see exactly what decisions that the defendant had that could have deescalated things. The first choice group, they were congregating outside the shop, and they were armed as well. You can tell that by the fact that they shot back after they were shot at. But the decision was not made to deescalate. The decision was made to escalate. And that led to a woman being killed. She was not

the intended target of the shooting, but she was present with other people from First Choice. The intended target was unscathed. And that happens when you shoot into a crowd. More people could have been hit and killed as well.

And I think it's important to point out some virtues of the victim. I know the Court has read the victim impact statement from her sister. But I just want to read a very short excerpt from it where she writes at the end, "I'm asking this Court for justice, not only for me but for her children," that is Ms. Ortiz's children, "and for the legacy of the beautiful woman she was. What was taken from us was precious, irreplaceable, and loved beyond measure. This was not just a crime. It was a destruction of a family." I really took that to heart. I know the Court has read this. I think an important message needs to be set that this was unacceptable. That this defendant and others involved in this crime had every opportunity to stop, but they didn't, and this is what happened.

And we recognize, as is he said in our submission, there are mitigating factors here. And we can a dispute about negotiations, but in some ways that's not even germane. We just wanted the Court to know our thinking. There are mitigating factors. The defendant has a loving family. Some of them are here. Many of them trafficked from out of state to be here. He is a smart person who has actually done well at

the MDC and has taken advantage of some programming that the MDC actually does offer it turns out. There was the contraband issue that we briefed as well on the other scale. But this defendant does have a lot of promise, and he's had a very difficult upbringing like many defendants who appear before the Court.

The victim was not the intended target. In fact, it appears that the defendant had affection for her and is truly sorry for what happened. And even though his role served to attempt to increase his status in the RICO enterprise, in fact, it led to the end of Certified Auto, and the rivals took over his shop. And there are other mitigating factors that the defense presented. And that, sort of, led to why our recommendation is 25 years and not something higher. The stat max is, of course, life.

The defense has asked for 15 years, there is not a massive, massive difference in the parties' views. But we've attempted to balance the awful aggravating facts with the mitigating facts and come up with a recommendation in our mind that makes sense and we urge the Court to follow. Thank you.

THE COURT: Can I ask you a few questions?

MR. HERMAN: Yes, your Honor.

THE COURT: Starting with the contraband, is there anything that you would like to say about it? I've looked at the most recent submission and, for example, one sort of

question mark in my head was the metal toolkit, which was kind of a last item on it. What that is exactly and what it might be used for?

MR. HERMAN: That's a good question, Judge. Those look like Allen wrenches to me. We had that same question actually. We were told -- the truth is that I don't know. But speaking with the BOP they offered two possibilities. One is that for contraband phones, in order for the inmates to charge them, they frequently take out the light in their cell and attempt to charge them through the raw electrical nodes behind that light, and perhaps the tools could have been used for that. The other option to us is it's a known issue of contraband coming through the kitchen, as was the case here. And there is more windows and ventilation in the kitchen for obvious reasons, you are cooking. So one option is perhaps tools are used to open windows or the window frame around it to try to get contraband in.

THE COURT: I see.

And then another question, and I think this was an important one from my perspective, there seems to be some disagreement between the parties as to how much responsibility Mr. Lugo bears for the actions of the person referred to in the presentence report as, I think, CC-1, the person who actually fired the shots. Based on what I have before me, what can I conclude about how much direction Mr. Lugo had in terms of what

happened? Sometimes it's described as he allowed it to happen.

MR. HERMAN: Right.

THE COURT: Sometimes -- the implication, I'm not sure that this is the language that's used, but the implication is that he directed it to happen.

MR. HERMAN: Right.

THE COURT: And those seem to me to be pretty different things.

MR. HERMAN: Yeah.

THE COURT: And they signify a different level of moral culpability. And it's not entirely clear to me what the record tells me about those things. I want to give you an opportunity to address that.

MR. HERMAN: Yeah. So as the Court allocuted earlier, there is no factual dispute as to what's in the PSR, the statement, the sums that the defendant made to CC-1.

THE COURT: What can I infer from those statements from your perspective?

MR. HERMAN: Right. Here is what I can say, to be sure, CC-1's time will come in terms of his answering for this. He is the shooter. We accept that. It's not disputed that CC-1 was a subordinate to this defendant and the enterprise. And if CC-1 felt it was appropriate to commit this shooting on his own, he had a gun, maybe he would have done that, but that's not actually what happened.

What happened was the driver called Lugo as the boss of Certified Auto, and Lugo got in touch with CC-1, that's what the phone records show. And they all had a meeting, the driver, CC-1, and Lugo to discuss what happened. And again, you can have multiple interpretations of how the Court should view these undisputed facts. Our interpretation is this meeting -- this wouldn't have happened unless CC-1 knew the whole enterprise, including the boss, Mr. Lugo needed to be behind what he was about to do, namely fire at the rivals.

So ultimately, given those facts, we think that Lugo does bear responsibility for that, given his role in the enterprise, even under the defense's characterization of allowing it to happen, he was the boss, and he knew it was going to happen. And he said what he said, as stated in the PSR. So ultimately, we view that as an aggravating factor.

THE COURT: I guess my question is, if the defense -- and obviously I'll give them an opportunity to address this -- but if their characterization is that Mr. Lugo allowed it to happen, how would you characterize it? Would you say that he directed it, that he ordered it even? How would you put it, if you disagreed with that?

MR. HERMAN: So we, as charged in the indictment, our interpretation of the statements is, of course, "are you going to do it or am I?" And CC-1 said "I'll do it." That is a form of ordering. I get that the defense doesn't characterize it

that way. And I understand that it could be subject to multiple interpretations. But at the end of the day, CC-1, Driver One, and Lugo met. Lugo is the boss. And CC-1 felt the need to converse with his boss about what was going to happen. And Lugo didn't say "don't do it." He said, "are you going to do it or am I?" So we do think that gives him tremendous culpability in what happened.

THE COURT: Just so I'm clear about what the government's position is, and I'm not saying I necessarily adopt it, but your position is based on that conversation, I should infer that Mr. Lugo ordered the shooting?

MR. HERMAN: One second, your Honor.

Judge, the reason we're being careful is I don't want to introduce something that is contrary to an allocution if the Court were to find there to be a factual dispute that's material. So I don't think there is really a factual dispute. It's really an analysis of the import the Court should have from the undisputed facts here.

THE COURT: The undisputed facts are the contents of the conversation between the driver, CC-1, and Mr. Lugo.

MR. HERMAN: Right.

THE COURT: "Are you going to do it or, am I going to do it." And what happens afterwards is CC-1 commits the shooting.

MR. HERMAN: Right.

THE COURT: And Ms. Ortiz is killed and two other people are hurt. I mean, those are the undisputed facts. But I think you're asking me to draw a conclusion about the causality here. And I think you're asking me to draw one that's different from the one that I believe that defense is asking me to draw. So I just want to just kind of sharpen the distinction between the two sides. Because I think if I agree with the defense, that suggests one thing. If I agree that Mr. Lugo bears a form of responsibility that is more than simply allowing something to happen, I think that says something else. So it's important in my sentence. I don't think it means a factual dispute between the parties with respect to the allocution because the facts are undisputed. The question is sort of what kind of conclusion do I draw about culpability from those facts.

MR. HERMAN: Here's what I would say. You have a subordinate member of the conspiracy telling his boss, this may happen. And Lugo says, either you do it or I do it. Meaning he either ordered, or he wanted it to happen. And coming from the head of the organization, the criminal organization, that's a serious statement to make to somebody. And CC-1 drove directly from that meeting to the shooting and committed the shooting. I know the defense doesn't characterize it that way and none of us were there. But at the end of the day, he either ordered it, or he expressed that it needed to happen and

he was happy for it to happen.

I don't know if there is really a material difference between those two, to be honest, Judge, just given his standing in the organization. And so we think it's something that the Court should find as an aggravating factor. But, again, we're not seeking a 50-year sentence here, as we might if the facts were even worse. And there are murder cases where such sentences imposed. There were murder cases in this building where a life sentence is imposed. But we recognize these facts are not as clearcut as some of those cases, and so we are recommending the sentence that we are.

THE COURT: Okay. I think I understand your position. If I may, one last question.

MR. HERMAN: Yes, your Honor.

THE COURT: In, sort of, the government's view to the extent that among the purposes of sentencing is to reflect the seriousness of the offense, just focusing on that one piece, if I were to compare the seriousness of Mr. Lugo's conduct with that of CC-1 from the government's perspective, and I know CC-1 is not before me, and I'm not necessarily comparing them, but just so I understand where the government is coming from, who has more culpability with respect to the seriousness of the offense?

MR. HERMAN: I think that's something that courts in this building often struggle to address and people can differ.

Is it the shooter who bears the greatest responsibility, or is it the boss who causes, allows, whatever term you want to use, something to happen?

We think that the person who created this atmosphere who created this violence, which is Mr. Lugo, he ultimately bears the burden of what happens. And the Court should sentence him accordingly. Not to absolve CC-1. His time will come, as I said. But at the end of the day, this is the leader of the organization who created the circumstances for this terrible act of violence occurred.

THE COURT: Okay. Thank you, Mr. Herman. Nothing further?

MR. HERMAN: Again, we just want to emphasize it was this defendant who propagated this culture of violence in the industry where disputes are resolved through violence and this is the outcome of that type of culture that he created.

THE COURT: Thank you, Mr. Herman.

With that, I want to turn to the victim impact statement. Ms. Ortiz's son, Mr. Brito, who is on the line.

Mr. Brito, if you can hear me, I want to give you an opportunity to make a statement now.

MR. BRITO: (Via telephone) Hello. Can you hear me?

THE COURT: Yes.

MR. BRITO: Hi, hello. My name is Jacob Brito. I serve in the United States Army. Before I get started, I just

want to thank you for allowing me to speak and being able to listen with my time that I had available.

Honestly, these last three years have been pretty rough for me. As soon as all this happened, I probably want to say not even four months later I just went and joined the Army. I feel like I did that more as a way to get away from everything. Like, I just turned 18. I was just given basically the responsibilities of an adult and without having, you know, my mother be able to help me because that's all I had. You know, I didn't have a father. I didn't have, like, anything. I didn't have -- my mother, she is everything to me, you know. I called her every day, every accomplishment I ever done, every bad thing, every good thing. I just called her. And she is the first person I would talk to.

After she passed, I still do that, you know. I still call her phone, leave messages every single day and just tell her how my day went. And when she passed I didn't get like -- it's not about like proper closure in the sense I got to say goodbye. Me and her, we ended on pretty bad terms, you know. And I never got to really call her. The months leading up to her passing, it was just constant arguments. I was just trying to get her away from the environment that the tow truck industry had created. It was just constant arguments trying to get her away from that.

And she believed that is where she could make things

right and change things. She was trying to make things official and get the proper license and all those things. And unfortunately, she didn't get to do that. And I never got to apologize to her for being rough on her, always just trying to get her to get away from everything. And it's hard, you know. Like, I enrolled into counseling and I speak to, like, people sometimes that work in like therapy. And, like, I've told them everything, and they themselves can't believe what I said, or it's just a lie or something that is overexaggerated. But that's just what happened. Honestly, it's hard to hear that when you are reaching out for help. And for something, for a professional to tell me that what I'm telling them is made up or what I'm telling them is so farfetched that they can't even help me, you know. Like, I'm more of an adult. I'm not even a child, like my two little siblings.

Like, I'm so sorry. I can take a second?

THE COURT: Sure. Of course, take as much time as you need.

MR. BRITO: It's frustrating. The day it happened right before she left, it was the first time she spoke to me like normal, you know. She invited me over. She invited me to get food with her after. It was the first day in a month we were actually getting along, and I just miss her. I just got off work. I was going to go to bed and get a phone call my friend telling me you need to come down to New York because I

lived in New Jersey at the time. You need to come down, something happened to your mother. I assumed she got into a car crash or something minor, you know, like something, and I would just go and pick her up. The whole drive was just I'm getting phone calls, like, over and over from everybody. And at this point I start thinking, like, what's going on? Why is everybody freaking out? And they gave me the address, and I ended up at the hospital. And I meet up with everyone and they tell me, Jacob, I'm sorry, but your mother is dead.

And in that moment, a little bit -- my brain, but I heard your mother is okay, everything is fine. And I just looked at everybody, and I'm like why? What's wrong. You just told me she was okay. Why is everyone crying? Why are we here? And they looked at me again and they said, no, Jacob, your mother is dead. She is no longer here. And I just had to sit down. She was everything I had. And she was all I had. I'm sorry.

THE COURT: It's all right. Take as much time as you need, please.

MR. BRITO: I just had to get away from everything, you know. And I moved out to Florida for a little bit after that with my grandparents. For a little bit I just felt I was strong. But my siblings, my sister who cried, my little brother is too young to understand. I just felt I had to keep it together for them, but I couldn't. I was just crushed. I

didn't know how. I didn't know how my sister was so strong. She just, you know, she was -- because she just tried to -- she act like -- she's everything, you know. She was a single mother the entire time that I was a bad kid, and I made her life harder, and she still chose to keep trying to give me the best. She really was all that I had. Because I knew my step dad wasn't going to stick around. I knew he wasn't -- a family member who moved away, and at the end of the day it was just me and her. That's like all of this is really hard because up until the very end it was almost like I never got to say sorry. Even a year before she even passed since the summer -- and then they got put into school there for a little bit. And then she passed.

I can't even fathom. I waited to try to reach out to try to see if he would even apologize because he was like a part of her life. Even after the passing of my father. My mother would do these things. And he said that he apologized. And it's just so hard to believe that now I'm hearing it three years later I'm sort of feeling that he has. It's just so much that I -- I thought about it -- I thought I was just going to talk and get my point across, but it's just -- I just didn't expect it to be this hard to just talk about her.

And every year like around the time it hurts, you know. I've gotten like many awards from the Army, a lot of accomplishments, thing that I feel like I should be proud of,

but I can't. I can't be proud of these things because she wasn't there to see it. She wasn't there to tell me that I did a good job. I just wanted to give her everything she gave me.

I'm sorry, I can't say anymore. I'm sorry. I'm done speaking.

THE COURT: Thank you, Mr. Brito. I know that was extremely difficult for you. And I just want to say that I'm terribly sorry for your loss. And I thank you for sharing that statement with the Court. And thank you for your service.

MR. BRITO: Okay.

THE COURT: I'll turn now to the defense, Mr. Commissiong.

MR. COMMISSIONG: May I take the podium?

THE COURT: Of course.

MR. COMMISSIONG: Your Honor, before turning to the substance of our sentencing argument, I just want to address a few issues that the government raised just briefly and move on.

Your Honor, first, it concerns the government's characterization of Mr. Lugo's alleged involvement in contraband at the MDC. The presentence report states exactly what happened and no more. It notes that there were no disciplinary infractions, that an investigation occurred, that no incident report was written and that Mr. Lugo received what's called a security threat profile due to the absence of video footage. That's the full extent of the PSR statement.

What the defense objected to is not the PSR, but the government's later reframing of that information, specifically the assertion that Mr. Lugo participated in or was responsible for a contraband smuggling operation. That characterization does not appear in the PSR, and we wholly reject that and object to that.

The PSR does not find that Mr. Lugo smuggled contraband, directed others to do so, or was adjudicated responsible for introducing contraband. It reports an unadjudicated administrative investigation that resulted in a classification decision, not a disciplinary finding, not a hearing, not a contested determination. So just putting Rule 32 timing aside, there was nothing in the PSR that required an objection because the PSR itself did not make the factual leap that the government now urges the Court to adopt.

And respectfully, your Honor, a security threat profile is not a risk management tool on the part of the BOP. It's not a finding of culpability. It's preventive; it's not adjudicative. The attached photographs show contraband existed they don't establish who introduced it, who controlled it, or that Mr. Lugo had a role beyond his presence in the work area.

We're not asking the Court to strike anything from the PSR. We are simply asking that the Court not adopt the government's expanded characterization of that material for sentencing purposes.

I just want to talk about the reframing of the conduct of conviction, which your Honor went into with the government. The government's reframing of the conduct of conviction goes beyond the factual basis of the accepted plea. At allocution Mr. Lugo admitted retaliation that a firearm was discharged and that a life was tragically lost. He did not admit to directing the shooting, orchestrating violence, or personally encouraging the use of deadly force in the manner now suggested by the government.

That distinction does not undo guilt. We are not suggesting that. It's just a matter of culpability and proportionality. Sentencing is not about retrying the case or trying the case, excuse me. It's about what we actually admitted, what the record supports and not for the most aggravated version of a narrative.

THE COURT: If I may ask?

MR. COMMISSIONG: Yes.

THE COURT: The same question that I posed to Mr. Herman, the facts are undisputed as far as, unless you tell me otherwise, the conversation that took place prior to the shooting between CC-1, the driver, and Mr. Lugo. Obviously, the facts of the shooting are undisputed. How do you think I should interpret the sort of causal chain between that conversation and the shooting and Mr. Lugo's role in that chain?

MR. COMMISSIONG: Well, I think that I'd like to rest on what Mr. Lugo said during the allocution. That because of his position, and I'm not necessarily going to call him "the boss" as the government called him or called CC-1 necessarily a subordinate. What I will say --

THE COURT: Well, he ran the shop, and CC-1 was an employee of the shop; right?

MR. COMMISSIONG: I believe it was more of a -- your Honor, I don't even want to get into the weeds, but I think it was more of a contractor-subcontractor role rather than an employer-employee relationship.

THE COURT: Okay.

MR. COMMISSIONG: But that doesn't take away the guilt here, your Honor, and we are not suggesting that at all.

What we argue is that because of Mr. Lugo's position, and which is why we crafted the allocution the way we did, he allowed the violence to occur. And in the chain of events, when you're looking at the accident that happened, the beating that happened from the people that were in front of the garage later on, this meeting, this conversation that occurs, and then the ultimate shooting, I think when you look at Mr. Lugo's role, and you take that phrase that the government presents, am I going to do it or are you? Am I going to handle it or are you? One thing we will say is that phrase, there was a conversation. There was a meeting. They allege there was a

meeting that happened. And there was an extended conversation. It wasn't, if I'm not mistaken, just the two of them. There were multiple people there. It was a conversation that happened. This was a phrase taken from that particular conversation.

Again, while we don't -- we're not saying that Mr. Lugo is not guilty. We're saying that there is sort of a range, a gradation of how the Court should look at his conduct. There is a difference, as your Honor pointed out, between ordering and direct and encouraging, I believe as the government used in their sentencing memorandum, and simply allowing something very bad to happen that can result in a very tragic event which is actually what occurred, your Honor.

I don't know if I addressed your Honor's concern.

THE COURT: I think I have a sense from the parties respective views on this. I want to allow you to proceed.

MR. COMMISSIONG: There is also an issue with respect to I think the government commented about the creation of an atmosphere of violence. The individuals that were assembled in front of that garage were armed, and one of them we believe had an extensive record of violence and had instigated the incident that actually preceded the shooting, preceded the meeting. And that individual is an extraordinarily violent individual. And in terms of who propagated the violence, we wouldn't put that on Mr. Lugo's shoulders. We would put it on that particular

individual, who I don't think is alive anymore. I think he was involved in another violent event that happened not too long after the killing in this case.

And then the last issue I want to address is that the government says that CC-1's time will come. In response to the Court's question about who bears more responsibility, CC-1 or Mr. Lugo, and we'll just note that as far as we understand, CC-1 has not been charged federally with respect to the conduct in this matter. And that's all I'll note for the record, your Honor.

Your Honor, what's clear here is that a woman has lost her life. Gloria Ortiz was someone's daughter, someone's mother, someone who was deeply loved. Her children will grow up without her, and her family carries a grief that no sentence can repair. That wound, your Honor, is permanent. Christian Lugo understands that. He understood that from the beginning. And he lives with the knowledge that nothing he says today and nothing that this Court does can undo that was lost. He's not running from that truth.

The government has urged the Court to impose a sentence of 25 years, suggesting that while Christian's childhood was tragic, his conduct perpetuated the very harm that marked his upbringing. Christian doesn't dispute the harm echoes forward, but that's not a reason to treat his history as irrelevant or aggravating. Childhood trauma matters at

sentencing precisely because it shapes judgment and impulse and responses to stress. It does not excuse what happened, your Honor. But it explains how a single devastating decision can occur. And sentencing is not about moral condemnation alone. It's about proportional accountability and the possibility of interrupting, rather than simply repeating cycles of harm. We're not asking the Court to ignore the seriousness of what happened. Christian has accepted responsibility. He's pled guilty to his role.

Not too long ago I was walking through the first floor lobby of 500 Pearl Street with another group of lawyers. Now, at the center of that space stands a striking statue. It's about 20 feet tall or so. It's a woman. She's blindfolded. She's holding two scales outstretched. She's balancing on one leg. She is precariously on the top of a sphere. One of the lawyers I was with looked up and said, "man, that looks impossible." And maybe that's the point, your Honor. That statue doesn't just represent justice. It represents how difficult justice really is, finding it and defining it and applying it. And especially in a courtroom like this one, where the stakes are high and no outcome feels without a cost.

Justice, particularly in the context of sentencing is hard, exceedingly hard for the Court, for the advocates, for the victim's family, and for the defendant. But it's in facing that difficult honestly and with care, that we come closest to

doing what that statue asks all of us to do, to hold the balance, even when it feels impossible.

Now, despite the chaos at the MDC, Christian has sustained close and meaningful relationships with his family and his long-time partner. In the harshest of environments he has chosen responsibility over resentment. He works, tutors, leads others to reflection and restraint. He intervened to save another person's life while incarcerated. He sought mental health treatment when despair set in. These are not the actions of a man indifferent to human life. They reflect something essentially about Christian Lugo. He is not unreachable. He is not unmoved, and he is not beyond repair.

Now, let's be honest about what 180 months in prison means. It's not a short sentence. It's 15 years of living every day inside a place that can be violent, degrading, and dehumanizing. It's 15 years surrounded by gang politics, under the watch of officers who often view people like him with suspicion and disdain. It's substandard food It's frequent lockdowns. It's limited contact with family and a future that must be rebuilt from the ground up upon release. Prison is not just a loss of freedom. It's a soul-smothering experience. And 180 months is not a light punishment for a serious crime.

Psalm 34:18 reminds us that, "The Lord is near brokenhearted and saves those who are crushed in spirit." That applies not just to those who mourn the victim but also to

those who caused harm and are now trying, in earnest, to change.

Your Honor, Christian is not asking to be spared. He is asking to be seen. We ask that the sentence imposed reflect the seriousness of the crime but also the possibility of something more, that justice in this case holds space for accountability and for mercy. Thank you, your Honor.

THE COURT: Thank you.

Mr. Lugo, if you'd like to make a statement. I'll give you that opportunity now.

MR. COMMISSIONG: Your Honor, do you want him to stand?

THE COURT: You can do whatever is most comfortable, Mr. Lugo. If you are going to read from something written, I would just ask that you try to read it slowly so that the court reporter can take it down.

THE DEFENDANT: First and foremost, I want to thank you for allowing me to speak for the first time.

I wrote this letter from the heart, so I mean everything I say. I want to speak from my heart because this is one of the hardest things I ever had to do. This whole situation has been overwhelming for me. There are days I still feel like I'm living a nightmare. I think about what happened, about my family, about my kids, and it weighs on me every single day.

Gloria Ortiz was family to me, not just a name in a case. She was my son's godmother. And she loved my children deeply. She remained close to me and my family, and her loss has left a permanent hole in our lives.

Before this tragedy, my life has already been marked by loss. I've already lost friends connected to her family, and those losses have stayed with me. They have taught me how fragile life is, and it really is. When Gloria was taken from this world, it broke me. Everything happened so fast. I never had time to properly grieve her death. I was overwhelmed with the pain and fear and confusion. I think about her children and her family a lot. They've been through so much. They experienced so much loss. And I know that they are living unimaginable pain. My heart truly goes out to them.

Being a father means everything to me. My children are also hurting. They lost someone they love, and they have also felt my absence. That is something that I carry in my heart every day. I think constantly about the kind of father they need to be. I accept responsibility for my actions and for the position I put myself in.

I'm deeply sorry for the harm and suffering that came from this tragedy. This experience has humbled me. It has changed me. It has forced me to look at my life in a different way. I'm committed to becoming a better man, a better father, and living with integrity and respect for life.

I respectfully ask the Court to consider my sincere remorse, my personal losses, and my genuine desire to keep growing and changing.

Thank you for allowing me to speak, your Honor.

THE COURT: Thank you, Mr. Lugo.

If there is nothing else from the parties, I'll take a brief recess.

Mr. Herman?

MR. HERMAN: Nothing further from the government.

THE COURT: Mr. Commissiong?

MR. COMMISSIONG: Nothing further from defense, your Honor.

THE COURT: Let's take about a ten-minute recess.

(Recess)

THE COURT: Before I proceed I want to thank counsel on both sides for your submissions which were very thorough. You gave me a lot to think about.

And Mr. Brito, if you are still on the line, thank you again for making your statement.

And Mr. Lugo, thank you for making yours.

Is there any reason why sentence should not be imposed at this time?

MR. HERMAN: No, your Honor.

MR. COMMISSIONG: No, your Honor.

THE COURT: Now, in imposing a sentence I'm required

to consider a number of factors set forth in federal law at 18 United States Code, Section 3553(a). Please bear with me because there are a lot of them. These include, first, the nature and circumstances of the offense and the history and characteristics of the defendant, which I'll speak to after I've enumerated all the factors that I've considered.

Second, the need for a sentence imposed to advance the purposes of sentencing. Namely, A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; B) to afford adequate deterrence to criminal conduct; C) to protect the public from further crimes of the defendant, and D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

Third, the kinds of sentences available.

Fourth, the guidelines range, which I have found to be 300 months or 25 years of incarceration.

Fifth, any pertinent policy statements.

Sixth, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.

Seventh, the need to provide restitution to any victims of the offense.

Ultimately, I'm required to impose a sentence that is

sufficient but no greater than necessary to comply with the purposes of sentencing that I've described. I've given a lot of thought and attention to the appropriate sentence in this case in light of the factors described above. In particular, as follows:

First, with respect to the nature and circumstances of the offense, it is I think quite obvious to everyone here that this is an extremely serious offense. A person lost her life. She was a single mother. She had three children who had recently already endured a separate tragedy and were orphaned as a result. The video of the offense, which has been provided to me is quite disturbing in its violence.

Now, Mr. Lugo did not pull the trigger himself. And there is -- while the facts are undisputed here, the ones that have been put me anyway -- there some dispute among the parties as to how much responsibility he bears for these terrible events. I think there is agreement that, at a minimum, he certainly permitted them to go forward. And I think it is clear, based on the undisputed facts that he bears some responsibility for the causal chain of events, starting with the conversation in which he posed the question, in essence, to CC-1, "are you going to do this or am I?" Followed by CC-1's action, the shooting in which not only Ms. Ortiz was shot but other people were as well. So the nature and circumstances of the offense are quite disturbing.

When I turn to the history and characteristics of Mr. Lugo, there is a broader pattern of criminal conduct here associated with the business that Mr. Lugo operated. And I think, as the government noted, the outcome here of violence loss of life was thought completely unforeseeable given the nature of the endeavor. Now, that being said, when I look at Mr. Lugo's history, I do see some mitigating factors in his past. I've read, very carefully, the mitigation report and the stories that were set forth therein. And I understand, Mr. Lugo, that you had an extremely difficult childhood, particularly in your teens, that you had to endure bouts of abuse, homelessness, and severe instability. And I take that into account in the sentence I'm going to impose.

I look at your time at the MDC, and it is, I think, a bit of a mixed bag. I don't adopt the sort of breadth of the government's characterization of contraband smuggling that occurred, but I think it was undisputed that it was not an insignificant amount. That being said, I do acknowledge the substantial efforts that you have made at MDC toward self-improvement and assistance to others. I've seen that you completed your GED and engaged in a lot of other coursework there. It seems that you're working consistently and that you are helping others as you can with vocational and religious activities. I've noted all of that. When I look at what's been put before me, and I'm not a priest. I'm not the final

judge of a person's character, but I can tell you what I see. And I see someone who is smart, someone who works hard and appears to be genuinely remorseful. At least that's what I see today. But historically, I've seen someone who does not or has not stayed within the rules of society and the laws that keep us safe and has been willing to engage in very destructive behavior, which led us here.

I've considered the sentencing guidelines range. I have taken it into account. But as the Second Circuit has advised, I do not presume it to be reasonable. And it does appear to be quite lengthy, notwithstanding the severity of this offense, and I take that into account.

When I look at the options that are put before me, there is no question that there will be a very long sentence imposed here. Defense asks for 180 months or 15 years, and I agree that that is not a light punishment. The government asks for a stipulated guidelines range sentence of 300 months or 25 years and probation recommends the same. And I don't mean to minimize the difference between those two recommendations, 15 years versus 25 years because we are talking about a decade. But we aren't talking about a sort of categorical difference where one side is asking for non-incarcerative sentence and the other side is asking for a significant sentence. Everyone agrees there is a long sentence to be imposed here, and I think that is appropriate.

Ultimately, I determine that a downwards variance is warranted in light of factors including Mr. Lugo's traumatic upbringing and my belief that he is a hardworking person who has shown that he can be a positive influence on other people in his time at MDC. And my view that the guidelines range, which I have considered, overstates Mr. Lugo's culpability in light of what I think we all agree is a somewhat unclear causal chain. It's not that he ordered the offense, exactly. But he did permit it, at least, permit it to happen.

So in light of all these factors, it's the judgment of the Court that Mr. Lugo is remanded to the custody of the Bureau of Prisons on Count One for a total of 168 months and on Count Five to a consecutive term of 60 months for a total of 228 months or 19 years.

Now, in addition to that term of imprisonment, I will impose a term of three years of supervised release on each count to run consecutively for a total of six years of supervised release. I find that such a term is sufficient but no greater than necessary to fulfill the goals of sentencing.

During your term of supervised release, Mr. Lugo, you will be subject to a number of conditions. Everyone, bear with me because there are a lot of them, and I'm required to read them out loud.

First, you will be subject to the following mandatory conditions: You shall not commit another federal, state, or

local crime. You shall not illegally possess a controlled substance. You shall refrain from any unlawful use of a controlled substance, and submit to one drug test within 15 days of release on supervised release and at least two periodic drug tests thereafter as determined by probation. You shall cooperate in the collection of DNA as directed by probation. And you shall satisfy any financial obligations, which I will discuss shortly.

Now, in addition to those mandatory conditions of supervised release, Mr. Lugo, there are standard conditions that apply, which I will impose. Among other things, first, you must report to the probation office in the judicial district where you are authorized to reside within 72 hours of the time you were released, unless the probation officer instructs you to report to a different probation office or within a different timeframe.

Second, after initially reporting to the probation office, you will receive instructions from the Court or the probation officer about how and when you must report to the probation office, and you must report as instructed.

Third, you must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the Court or the probation officer.

Fourth, you must answer truthfully the questions asked

by your probation officer.

Fifth, you must live in a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements, such as the people you live with, you must notify the probation officer at least ten days before the change. If doing so is not possible, you must notify the probation officer within 72 hours of becoming aware of the change or expect the change.

Sixth, you must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by conditions of your supervision that he or she observes in plain view.

Seventh, you must work full time, at least 30 hours per week, at a lawful type of employment unless the probation officer excuses you from doing so. If you do not have full-time employment, you must try to find full-time employment, again, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work, you must notify the probation officer at least ten days before the change. And if doing so is not possible, you must notify the officer within 72 hours of becoming aware of the change or expected change.

Eighth, you must not communicate or interact with someone you know is engaged in criminal activity. If you know

someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of a probation officer.

Ninth, if you are arrested or questioned by law enforcement, you must notify your probation officer within 72 hours.

Tenth, you must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon, meaning anything that was designed or modified for the specific purpose of causing bodily injury or death to another person.

Eleventh, you must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting permission from the Court.

Twelfth, you must follow the instructions of the probation officer related to the conditions of supervision.

In addition to all of that, I will impose certain special conditions of supervision which I find are sufficient but not greater than necessary to facilitate the goals of sentencing.

First, you shall submit your person and any property, residence, vehicle, papers, computer, or other electronic communication, data storage devices, cloud storage, or media and effects to a search by any United States probation officer and if needed with the assistance of any law enforcement. Any search is to be conducted when there is reasonable suspicion

concerning violation of a condition of supervision or unlawful conduct. Failure to submit to a search may be grounds for revocation of release. You shall warn any other occupants that the premises may be subject to the searches pursuant to this condition. Any search shall be conducted at a reasonable time and in a reasonable manner. I find that this condition is warranted based on the individual facts of this case, including Mr. Lugo's conduct including the crime of violence at issue here and also his conduct including mail or wire fraud and Mr. Lugo's past conduct involving narcotics. I find based on the combination of these facts that this condition is necessary for deterrence and the protection of the community.

Second, you must participate in an outpatient treatment program approved by the United States Probation Office which program may include testing to determine whether you've reverted to using drugs or alcohol. You must contribute to the cost of services rendered based on your availability to pay and the availability of third-party payments. The Court authorizes the release of available drug treatment evaluation and reports, including the presentence report to the substance use disorder treatment provider. And I find that this condition is warranted based on the facts of this case, including Mr. Lugo's self-reported history of drug abuse, as detailed in Paragraphs 96 and 97 of the presentence report. I find this condition will assist Mr. Lugo with community reentry

and provide him with the needed medical care in the most effective manner.

Third, you will be supervised in the district of your residence.

With respect to financial penalties, I will not impose a fine because I don't believe you have the ability to pay one, and because I believe that it will interfere with your other financial obligations and reintegration. With respect to restitution, I will not impose restitution which has not been raised as an issue in this case.

And finally, there is a special assessment that I must impose, it is mandatory, of $100 on each count for a total of $200 which shall be due immediately. And finally forfeiture is not requested here.

Does counsel on either side know of any legal reason why this sentence shall not be imposed as stated?

MR. HERMAN: No, your Honor.

MR. COMMISSIONG: No, your Honor.

THE COURT: The sentence as stated is imposed.

I find that the sentence is sufficient but not greater than necessary to satisfy the purposes of sentencing set forth in federal law, including the need to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to this defendant and others and to protect the public from further crimes.

Is there a request from the defense as to a recommendation from the Court as to the designation of a facility?

MR. COMMISSIONG: Yes, your Honor. If you could assert in the judgment that he be placed in a facility as close to the New York City area as possible to facilitate visits with his family and his children.

THE COURT: Any objection from the government?

MR. HERMAN: No, your Honor.

THE COURT: Okay. I will recommend to the Bureau of Prisons in my judgment that Mr. Lugo be placed in a facility as close to New York City as possible in order to maintain family contacts.

Mr. Lugo, to the extent that you haven't given up your right to appeal through your agreement with the government and your plea of guilty, you have a right to appeal. If you are unable to pay for the cost of appeal you may apply for leave to appeal *in forma pauperis*, which means without charge to you. The notice of appeal must be filed within 14 days of the judgment of conviction.

I'll just say a few words in conclusion to Mr. Brito, and the family of Ms. Ortiz, I just want to reiterate that I am terribly, terribly sorry for your loss particularly with the knowledge that it comes on top of a recent previous one. I know that nothing can bring back your mother. Nothing can

bring her back. But the lengthy sentence imposed today is intended to reflect the magnitude of what's happened, and I hope that with this process complete, you can begin the process of obtaining some finality.

Mr. Lugo, I have only been on the bench for a short while. I think everyone knows that. And this is the most terrible act that I have seen in my relatively short time on the bench. I've given you a downward variance in light of your history and what I believe can be your future. But the sentence that I have imposed is severe because I believe it is necessary to reflect the severity of what's happened. And I know that you have a very long road ahead of you. I will add what is often said at sentencings in this district, quoting a very well-regarded lawyer, that no one can be reduced to a single act in their lives. I know that you've endured many difficulties in your life, and despite those, you've found a way to make a living for yourself and to provide for your family. And you have, in many respects, managed to help other people at MDC and yourself. And I know that is a far from easy thing to do. I'll just say that I hope you can carry and maintain that same intention in the years ahead.

Is there anything else from the parties before we adjourn?

MR. HERMAN: We would just move to dismiss any open counts.

MR. COMMISSIONG: No objection.

Nothing else from the defense.

THE COURT: Okay. The motion to dismiss the open counts is granted in light of the lack of objection from the defense and also because it is necessary, I believe, to facilitate the plea arrangement in this case.

And with that, we are adjourned.

(Adjourned)